**SUFFOLK PARENTS OF HANDICAPPED ADULTS; and Irene Hoops; Frank Gatland; Frances Sensale Lenzo; Joyce B. Aron; Lillian Melville Hamid; Margaret DeVoe; Jane Doe, and Richard Roe, as parents and guardians of, respectively, Lora Hoops; Andrew Gatland; James Sensale; Lourdes Aron; Glenna Hamid; Karen DeVoe; John Doe, and Rachel Roe, Plaintiffs,**

**v.**

**George E. PATAKI, as Governor of the State of New York; Robert J. Gaffney, as County Executive of Suffolk County; Thomas A. Maul; James L. Stone; Brian Wing, and John B. Wingate, as Commissioners of, respectively, the New York State Office of Mental Retardation and Developmental Disabilities; the**

New York State Office of Mental Health; the New York State Department of Social Services, and the Commissioner of the Department of Social Services; and Suffolk County, Defendants.

Civil Action No. CV–96–0288 (DGT).

United States District Court, E.D. New York.

April 4, 1996.

William J. Burke, New York City, for Plaintiffs.

Amy Abramowitz, NYS Department of Law, New York City, James M. Catterson, Suffolk County Attorney's Office, Hauppauge, NY, for Defendants.

### MEMORANDUM AND ORDER

TRAGER, District Judge:

█ This case is the second of possibly three cases concerning the care and treatment of profoundly disabled and medically fragile adults whose rights under the federal Constitution have been gravely imperiled as the result of an unfortunate funding dispute between the State of New York and three of its local governments. These adults have been the beneficiaries of a joint state and local program called Transitional Care Funding (TCF). The program was developed to provide a bridge between educational placements of severely disabled persons in residential programs and long-term adult residential care after they "aged-out" of educational placements at the end of the school year in which they became twenty-one.

The first suit arose from the withdrawal by New York City from TCF at the end of May 1995, and, ultimately, resulted in State assumption of full responsibility for funding.[1] Following New York City's successful withdrawal, the Suffolk County Executive, always

1. This result was ordered by this court in *Brooks* v. *Pataki*, 95–CV–2902. An appeal is pending.

frustrated by the State's refusal to assume full financial responsibility for the program, finally determined to emulate New York City's withdrawal from the program and, last November, obtained the necessary approval from the County Legislature.[2]

## Background

### (1)

The present action involves four severely disabled, multiply handicapped, plaintiffs,[3] all of whom were placed, with the approval of the State, in out-of-state institutions as children, years ago, because no appropriate treatment programs were available in-state. For example, one plaintiff, aged twenty-five, diagnosed as functioning in the profound range of mental retardation, with cerebral palsy and a seizure disorder, has been at The Woods School, in Langhorne, Pennsylvania, since she was placed there by a Suffolk County local school district nineteen years ago, at the age of six. Pltf.Mot. Hoops Aff.

There is no dispute by either the County or the State defendants that the plaintiffs' disabilities are severe nor that plaintiffs require institutionalization. The State's position, however, is that, under state law, it is authorized only to reimburse localities for their expenditures for the care of TCF clients. Further, the State maintains that the court has erred in finding that the constitutionally protected liberty interests of these severely disabled persons are impaired by the State's role in the abrupt cessation of funding for their placements without providing adequate opportunity for them to locate alternative care in New York. Tr. at 26–27. Abramowitz Ltr. dated March 8, 1996 at 4.

The State disclaims responsibility for TCF recipients on the basis of its use of third parties: localities for payments to providers and financial management and private institutions for provision of care. The State also relies on the expressed disclaimer of "entitlement" in the TCF statute.[4] The State's division of responsibility for TCF recipients among several of its agencies, as well as local governmental bodies—ranging from local school districts to the county—has also made it possible for a State representative to come into court and assert that TCF recipients, despite their having been placed in institutions many years ago with the specific approval of the State Education Department, stand in the same position as persons coming into placement from their own homes. Tr. at 21, Brooks Tr. at 27. The State's role in educational placements, prior to the TCF recipients "aging-out," has been neither acknowledged nor denied by the State, which has sought to confine its role to that assigned to two of its agencies, the Office of Mental Retardation and Developmental Disabilities (OMRDD) and the Office of Mental Health (OMH).

Nor does the County dispute the plaintiffs' need for care. On June 9, 1995, Suffolk County (County) Department of Social Services (DSS) Commissioner Wingate wrote to the parents of plaintiff Sensale, who was to "age-out" of his educational placement on July 1, 1995, in response to a letter Sensale's parents had written to the Legislature to protest the County's announced intention of accepting no new TCF clients on that date: "Please be assured that it was never my purpose to suggest that your son does not need the level of care he is presently receiving at the Woods School." County Ex. I. In his July 25, 1995 letter to the TCF parents, Commissioner Wingate wrote:

the Blind in Massachusetts, has returned home. Tr. at 18–19.

**2.** Westchester County has also withdrawn from TCF. A lawsuit has been filed in this court against it and the State. *Westchester Advocates for Disabled Adults v. Pataki*, 96–CV–0930.

**3.** Originally there were six plaintiffs. However, subsequent to the commencement of this action, one plaintiff, James Sensale, who 'aged-out' in 1995, has been placed in an Office of Mental Retardation and Developmental Disabilities (OMRDD) facility, and another plaintiff, Glenna Hamid, who had been at the Perkins School for

**4.** The TCF Statute, Chapter 600 of the laws of 1994, § 16:

No provision of this act shall be deemed or construed to create any right, interest or entitlement for any individual to receive mental hygiene, education or social services funds or services, or placement in a mental hygiene facility, or any other right, interest or entitlement to services, funds or placement.

The fact that Suffolk County can no longer cover the cost of Transitional Care ... *does not mean a disruption in the continuity of care for [your child].* Use the remaining months of this year to let OMRDD know of your concerns and urge them to find or develop what is long overdue—appropriate adult facilities for all those who aged out of residential care. County Ex. A (Emphasis added.).

All of the plaintiffs, with one exception, were originally placed in out-of-state residential care as children by Suffolk County local school boards with the approval of the State Education Department[5] because no adequate programs or placements were available in New York State. These educational placements could be made *only* after five refusals by in-state institutions and *only* if the State approved. Tr. at 28. The TCF recipients in Suffolk County in November 1995 range in age from twenty-two to thirty-one. County Ex. E.

### (2)

TCF was established in 1983 because the State could not accommodate all the individuals who had been placed for educational reasons as soon as the school year ended in which they turned twenty-one, a process called "aging out."[6] Thus TCF recipients remained in their educational placements even after they reached twenty-one and the locality's educational obligations to them under federal law expired. TCF provided that their expenses were to be paid under a formula in which localities were reimbursed by the State for fifty percent of the costs of continued placement until January 1, 1995, when the State's share increased to sixty percent.[7] In 1996, under the statute passed in 1994, new entry into TCF was to be ended, and in 1999, the State was to assume complete responsibility for all those remaining in TCF status.

As previously mentioned, this lawsuit arose out of the County's unhappiness with the State's failure to assume full funding of residential placement of these severely disabled adults. This would ordinarily be solely a responsibility of the State. It is a responsibility that will, in fact, be the State's once the plaintiffs are placed appropriately in adult facilities in New York State. The County's frustration with the State plus budgetary pressure led it to withdraw from the program under which it, after State reimbursement, paid forty percent of the costs of these individuals' care. The 1996 annual cost of the program was estimated, in a County legislative submission to be $1,863,858. County Brf. Addendum I. As the County would be entitled to reimbursement of sixty percent of that amount, its actual 1996 cost would be $745,543 if the State placed none of the current group of TCF recipients before year end.

This court has dealt previously with a locality's withdrawal from the TCF program in *Brooks v. Pataki,* 95–CV–2902. *See Brooks v. Pataki (Brooks I),* 908 F.Supp. 1142, 1144–45 (E.D.N.Y.1995), (describing the history of TCF in New York State.) In *Brooks I,* plaintiffs, New York City residents, were granted a preliminary injunction against the State defendants that ordered the State defendants to fund the plaintiffs' placements during a transition period in which in-State placements are sought and given appropriate

5. The exception, plaintiff Sensale, came from foster care, and was, apparently, originally placed, not by a local school board, but by the County, itself, in his TCF residential placement at The Woods School, Kelsch Aff. dated March 13, 1996 ¶ 3, but has now been placed in-state by OMRDD. Tr. at 16.

6. In 1983, a subcommittee of the State Legislature reported that the problem was the result of, first, the passage of the Federal Education of All Handicapped Children Act in 1975 guaranteeing a "free appropriate public education" to all handicapped children and, second, the deinstitutionalization of OMRDD following the Willowbrook Consent Decree. "Aging Out: The Crisis in Transition at Age 21 for Disabled Individuals in Need of Adult Services," N.Y. State Assembly Subcomm. on Human Rights, January 14, 1983, at 2, Pltf.Ex. 7.

7. Prior to the passage of the TCF statute, Chapter 600 of the laws of 1994, TCF was simply an item in the State's Budget resolution, with no statutory authorization. Susan Demers, General Counsel of N.Y.S. Dep't of Social Services, Mem. to Elizabeth D. Moore, Counsel to the Gov., 7/21/94, *New York Council for Exceptional People v. Pataki (NYCEP),* Record on Appeal to the App.Div., 1st Dep't, at 90.

review. *See, id.* at 1149–54, (analyzing the constitutional issues presented in that case.) *See also Brooks v. Pataki (Brooks II),* 908 F.Supp. 1157 (E.D.N.Y.1995) (denying State defendants' request for a stay pending appeal.)

The Suffolk County Executive has an extensive history, going back almost eight years, of omitting the TCF program from its proposed budget. These efforts have been repeatedly thwarted by the County Legislature (Legislature), at least, that is, until November 1995. A further effort was made to restore the program in February 1996.

In 1989, the County Executive announced its decision to withdraw and notified state agencies, providers and parents. The County Legislature then restored full funding and the County Executive did not veto the program. (Plaintiffs aver that County Executive Halpin attempted to cut the program even earlier than this, in 1988, and the County Legislature restored the program. Probeyahn Aff. ¶ 5.) Again in 1990, the County Executive eliminated TCF from the County budget and notified all parties, but again the County Legislature restored TCF funding. Kelsch Aff. dated February 23, 1996 ¶ 23. Plaintiffs submitted a copy of a June 10, 1992 letter from Robert J. Gaffney, County Executive, to Albert Robidoux, Director, Long Island Developmental Center (the local OMRDD office, a Developmental Disabilities Service Office (DDSO)),[8] notifying him that the County would fund only the TCF incumbents as of February 13, 1992 and only until December 31, 1992. Pltf.Ex. 13. The Legislature restored the funds, then as before. Probeyahn Aff. ¶ 7. Only in 1991, 1993 and 1994 were there no efforts by the County Executive to omit TCF from its proposed budget. The plaintiffs suggest that the 1993 and 1994 restraint was the result of the pending TCF reform, vetoed by Governor Cuomo in 1993 but reintroduced and enacted in 1994. *Id.* ¶ 7–8.

The following narrative of the County's 1995 actions regarding TCF is based on the chronology submitted by the County. Sklar Ltr. dated March 15, 1996.[9] In May 1995, one year before the TCF statute eliminated new intake into the program, County DSS Commissioner Wingate announced that the department would not accept the eight individuals who were "aging-out" at the end of that school year. The County DSS Commissioner notified the State, the schools and the TCF recipients' parents/advocates of this plan, but, as before, the County Legislature, on September 8, 1995, restored full funding.

In June 1995, County DSS Commissioner Wingate submitted his proposal to omit TCF from the County's proposed budget for the coming year, and, in July, notified the parents of incumbent TCF recipients (but not the parents of those who aged out in mid-1995) and the State commissioners who are defendants here (or their predecessors), as well as the OMRDD director for Long Island, Marvin Colson, of the plan. The County did not attach copies of the Commissioner's letters to the institutions in July 1995, but it avers that notification was also sent to the institutions at that time. Sklar Ltr. dated March 15, 1996, Chronology.

Following the announcement by County DSS, in July 1995, regarding its planned 1996 budget, as had also occurred following the May 1995 announcement that no new TCF recipients would be accepted, parents and other interested parties began lobbying the County legislators, meeting, as previously, with encouragement from the legislators.

The County DSS refusal to accept the 1995 TCF intake was an active issue over the summer of 1995. For instance, on July 28, 1995, the presiding officer of the Legislature wrote the local OMRDD director, acknowledging the effort to deny TCF funding to the eight persons who "aged out" of educational placements in 1995, stating:

As Presiding Office (sic) of the Suffolk County Legislature, I want to advise you

---

**8.** The Long Island Developmental Disabilities Service Office is the local office for Nassau and Suffolk Counties of the State agency, OMRDD. *See* N.Y. Mental Hyg.L. § 13.17.

**9.** Plaintiffs' supplemental illustrations of Executive defunding of the program followed by Legislative restoration are merely corroborative of the pattern established by the County's own submissions.

and the schools that provide the services received by Suffolk county residents, that we are diligently working together with the state and the county to find the necessary funding to maintain the level of services needed by these individuals.

This is written, in the hope that the schools will not act precipitously against the interest of the clients who need their care and will be aware of the legislature's efforts, along with the State, to find the necessary funding.

Attached to Abramowitz Ltr. dated March 8, 1996.[10]

On September 8, 1995, the County Legislature, by a vote of thirteen in favor, four opposed, and one abstention, approved a bill directing payment, through 1995, of the costs of residential placement of the eight persons who "aged-out" in 1995. The County Executive approved the bill on September 22, 1995.

Although the County DSS intent to omit TCF from the 1996 County budget was announced in July 1995, the County Executive's 1996 Recommended Budget that formally omitted TCF was presented to the Legislature and the public only on September 14, 1996. In October 1995, the Legislative Budget Review Office released its evaluation of the Recommended Budget, recommending against restoration of TCF in 1996. On October 23, 1995, County DSS Commissioner Wingate stated, in his message to an Operating Budget Meeting of the Legislature, that an amount sufficient only for carryover 1995 TCF expense had been included in the 1996 budget proposal for his agency.

On November 8, 1995, the Legislature approved the 1996 budget bill with only the carryover amount for TCF. The Legislature also voted on a separate resolution to restore funding for TCF in the 1996 County Budget on that date. A majority, eleven of eighteen legislators, voted for the resolution but that margin failed to achieve the super-majority of fourteen required to restore the funds.

On November 24, 1995, more than two weeks after the adoption of the 1996 County Budget omitting TCF on November 8, 1995, County DSS Commissioner Wingate wrote the State Defendants, giving "official notice that effective January 1, 1996, Suffolk County Department of Social Services will discontinue funding for all individuals in the Transitional Funding Program." (Emphasis added.) He attached a listing of eighteen TCF recipients that included six persons who had not been on the July list (some of those who aged out in 1995) and omitted two persons who had been on the July list. County Ex. E (November letters to State officials) (emphasis added) and Ex. B (July letters to State officials). The County also notified the institutions at which the TCF recipients resided that TCF funding would end on December 31, 1995.[11] County Ex. D.

(3)

Although disclaiming all constitutional responsibility for the Suffolk County TCF recipients, the State concedes that it received and took cognizance of Suffolk County's "official notice" of its intent to withdraw from TCF contained in the Commissioner Wingate's letter of November 24, 1995. Abramowitz Ltr. dated March 8, 1996. The State notes, however, that, even after the County's November 1995 letter, it received a further

10. The County objects, not to the validity of the letter, but to the estoppel they believe that the State is asserting to have resulted from it. "If the State defendants are trying to either extract themselves from liability to the plaintiffs, or are trying to draw Suffolk County into sharing some liability based upon letters written by a member of the County Legislature, then Suffolk County respectfully insists that the State present its excuses for failing to act by competent witnesses subject to cross examination." Sklar Ltr. dated March 13, 1996. No estoppel is attributed to unilateral acts of either of the County's governmental branches where approval by both is required.

11. In its chronology, the County states that it sent letters to the institutions in July 1995, notifying them that funding would end on December 31, 1995. However, although the County has submitted samples of each of the other letters sent on that date, and has included samples of letters to institutions with its sets of letters for the May defunding of new TCF intake and for the November defunding official notice, it has not included a sample of a July 1995 letter to institutions with its other July 1995 letters to the recipients and to the State.

communication from the Presiding Officer of the County Legislature, indicating further efforts on the part of the legislators to restore funding. On January 22, 1996, the Presiding Officer of the Legislature, Donald R. Blydenburgh, in a letter to the OMRDD Long Island director, Marvin Colson, wrote:

As Presiding Officer of the Suffolk County Legislature, I want to advise you and the schools that provide the services received by Suffolk County residents, that I have introduced a resolution to restore the funds necessary to complete this program in 1996. The resolution will come before the Budget Steering Committee the end of February. If it passes out of committee, it will come before the general legislature at the March 5, 1996 meeting.

I am working diligently to find the necessary funding to maintain the level of services needed by these individuals. This is written in the hope that the schools providing services will not act against the interest of the clients who need their care.

Attachment to Abramowitz Ltr. dated March 8, 1996.

The State has not claimed that this communication has been taken as any indication that expedited placement of the Suffolk County TCF recipients is not necessary. During oral argument on March 6, 1996, the State defendants reported having placed all of the 1995 TCF intake, *id.,* as well as having a potential placement for one of the named plaintiffs. Tr. at 18.

### (4)

Plaintiffs filed this action on January 23, 1996. On February 21, 1996, plaintiffs moved for a preliminary injunction against both defendants and, in the alternative, against the State alone, returnable March 6, 1996. The County did not answer the complaint but, on February 29, 1996, cross-moved for my recusal and, in the alternative, for dismissal of the complaint per Rule 12(b)(6). All parties have submitted briefs, affidavits and documents. Oral argument was presented on March 6, 1996. The County's motion for my recusal and its request for certification of that issue to the Second Circuit were denied for the reasons stated on the record. Tr. at 2–6.

Following oral argument the State submitted a letter brief, dated March 8, 1996, and, at the Court's invitation, Suffolk County submitted a reply dated March 13, 1996. The County also submitted, on March 15, 1996, again at my request, a chronology of the County's legislative and executive actions with regard to TCF funding during 1995.

### Discussion

This court found, in *Brooks v. Pataki I,* 908 F.Supp. 1142, 1149–54 (E.D.N.Y.1995), that constitutionally protected liberty interests of the profoundly disabled adults in the TCF program were implicated by the extensive and determinative State involvement in their initial institutional placement out-of-state and in their remaining in out-of-state placements.[12] The State was involved in plaintiffs' institutional placements, both before and after the plaintiffs were twenty-one, due to the State's responsibilities for education and for the care of severely developmentally disabled adults.[13] The fact that the State has shifted responsibility for these TCF recipients from the State Department of Education to the Department of Social Services and the Office of Mental Retardation and Developmental Disabilities and has placed responsibility for direct financial administration on the locality, does not mean that the State itself is not responsible for the plaintiffs' institutionalization. The State seems to argue that, because everyone is

---

**12.** Six Suffolk County TCF recipients, not named plaintiffs, are in non-adult placements within New York State. Tr. at 18. The issues presented by these placements are not before the court here nor in *Brooks v. Pataki.* The State's refusal to fund these in-state TCF placements is based on continuing placement of adults in programs for children, rather than on the blanket refusal to fund out-of-state placements. Mr. Kietzman of OMRDD stated that OMRDD was working to "find a certified basis" to provide payment to two of these in-state TCF recipients. Tr. at 17.

**13.** "[T]he State reimburses school districts 85 percent on average ..." State Budget Memorandum on the TCF Statute (1994), (Budget Memo), *NYCEP* Record on Appeal at 111. The State reviewed out-of-state placements by school authorities on an individual case-by-case basis. Tr. at 28, *Brooks* Tr. at 45.

responsible, no one is responsible. The State has been far more than a passive funding source with no involvement in individual cases. The State cannot avoid its constitutional responsibilities by its delegation of parts of them to others.

In addition, in *Brooks*, the State took precipitate action following the cessation of City TCF funding that endangered the fragile individuals involved. *See Brooks I*, 908 F.Supp. at 1152–53. The precipitate attempts at transfer by the State seen in *Brooks* were, happily, absent here, but the State involvement in the plaintiffs' placement is as pervasive here as it was there. Here, however, no state court judgment precludes analysis of the locality's constitutional obligations to the TCF recipients it had funded for many years.[14]

### (1)

The task of transferring multiply disabled persons like the plaintiffs from one institutional treatment setting to another cannot be accomplished overnight or even in a few months. As the New York State Executive Department noted in its Memorandum concerning the TCF statute in 1994, referring to persons in transitional care: "[T]he potential for serious disruptions in care for these young adults, who have less tolerance for disruption than most others in our systems of care, remains higher than is warranted." *New York Council for Exceptional People v.*

*Pataki (NYCEP)*, Record on Appeal to the App.Div., 1st Dep't, at 85. New York City's experience, even after the State had agreed to a settlement in 1991 under which it would place most priority TCF referrals within *twenty-four months* and all within thirty months, may be illustrative of the difficulties. There, OMRDD was unable to place one hundred forty-four City TCF referrals in the agreed upon twenty-four month period. Seventy TCF referrals remained unplaced thirty months after the City had referred them for placement.[15]

The large numbers of individuals then involved may have required such an extended period, but a more recent agreement between the City and OMRDD also illustrates the actual time required to accomplish transfer from TCF placement to in-state placement, under more current conditions. The Memorandum of Understanding between OMRDD and the City, signed in January 1995, was intended to provide "orderly transfer" between TCF and the OMRDD system for the 108 individuals in TCF status for which OMRDD was responsible. The agreement provided the process that had been specified in the TCF statute: an offer of an appropriate available placement to the TCF recipient, the opportunity to challenge the proposed placement administratively before OMRDD staff members under Mental Hyg.L. § 13.38 (the codified

---

**14.** In *Brooks*, following *Migra v. Warren City School Dist. Bd. of Educ.*, 465 U.S. 75, 85, 104 S.Ct. 892, 898, 79 L.Ed.2d 56 (1984) ("Section 1983 ... does not override state preclusion law and guarantee petitioner a right to proceed to judgment in state court on her state claims and then turn to federal court for adjudication of her federal claims."), the plaintiffs' failure to raise constitutional claims against the City in their litigation in state court foreclosed consideration of the City's constitutional liability. The State had, however, committed further constitutional violations against the plaintiffs subsequent to the conclusion of the state proceeding and thus res judicata did not bar holding it liable. *See Brooks I* at 1156.

**15.** New York City made extensive efforts to force the State to honor its obligations to TCF clients through legal actions. In 1985, it brought suit against OMRDD for its failures "to plan for, develop and provide beds to mentally retarded and/or developmentally disabled persons referred

by the City's Child Welfare Administration and mentally retarded hospital patients referred by [Health and Hospitals Corporation]." *City of New York v. Webb*, Index No. 40313/86, (Sup.N.Y.County), Stipulation and Order filed May 8, 1991. In 1991, that lawsuit was settled under an agreement in which OMRDD undertook to place 200 of 250 priority referrals from the City each year within a period of twenty-four months, and in no case to fail to place a priority referral within thirty months. Because OMRDD failed to meet even these generous time-frames in its commitment to the City (for example, the seventy priority referrals that waited over thirty months for placement), the City applied to State Supreme Court for an order of civil contempt against the State. In October 1995, Justice Collazo, although declining to order a finding of contempt against the State, ordered OMRDD to pay the City over $9 million for the costs of care borne by the City through September 1994 as the result of OMRDD's failure to comply with its agreement. That order is on appeal.

TCF statute.) *Id.* at 70. Also, the TCF statute mandated the preparation of a transfer plan for each adult by the discharging institution that "include[s] any information necessary to facilitate a safe transfer, such as specific problems, a schedule for administering medications and behavior unique to the individual." § 7.38(f).

Before the appropriateness of an available institutional placement can be determined and a TCF recipient transferred, the constitutional standard established in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) and *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239 (2d Cir.1984), *see infra* p. 980, must be satisfied. Determination of the appropriateness of a new placement and transfer, as with any other act significantly affecting mentally retarded persons who have been institutionalized with the approval and financial support of the State, must reflect the exercise of professional judgment. For example, in *Brooks,* OMH notified the TCF recipients' "advocates" that their process would begin with an interview of the TCF recipient and evaluation of his or her clinical records by case management contractor or OMH staff.[16] Ethel Davis Jackson Ltr. dated February 27, 1995, *Brooks* Pltf.Ex. 7G.

Currently, OMRDD representatives have expressed a preference for a more cooperative, consultative and less formal (and adversarial) process than that provided in the statute and in the Memorandum of Understanding with the City: "It is the State's view of . . . this case that the formal offer of a placement followed by objection, by an opportunity to object and a hearing is a last resort kind of thing, really only useful if you want to look at it that way where you're trying to cutoff funding from someone who is, you know, who you're not—who[se] expectation you're not meeting for whatever reason." Tr. at 20.

In any event, the process of determining what constitutes an appropriate placement for severely disabled persons like these plaintiffs must be a consultative one among the professionals at the State agency, the discharging facility and the proposed new facility and the "advocate(s)" for the TCF client. These essential steps take time to accomplish.

To give some sense of what is involved, it may be instructive to compare the process required here to the much simpler, but not trivial, circumstance of the transfer of a nondisabled student from one college to another. First, the potential transferee's requirements must be determined and her qualifications documented, with transcripts and test scores and possibly letters of recommendation. Then, these requirements must be compared to available programs, a comparison that often involves a visit to the institution under consideration and discussion with the institution's staff of the match between the applicant's requirements and qualifications and the institution's offerings and requirements.

If both the applicant and the institution agree about the match between offerings and requirements *and* the institution finds the applicant qualified *and* there is space available, then transfer can take place. If requirements and offerings do not match or if the potential transferee is not accepted or if no place is currently available, the search must resume. To shorten the time period it may be possible to proceed with regard to several colleges simultaneously. Ordinarily in a college transfer, the student and, often with her parents' assistance, conducts all her own investigation, as her and her parents' resources (possibly with help from the institution) will most likely finance it.

Here, where the State will pay the institutions' charges, the State must also be involved but the decision making process becomes potentially more complex.[17] TCF

---

16. Although none of the Suffolk County TCF recipients remaining at year end 1995 were OMH clients, Tr. at 14, the OMH letter to its *Brooks* plaintiffs provides a clear statement of process prescribed by State professionals in effectuating transfer.

17. Charges for Suffolk County TCF plaintiffs in May 1995 ranged from $72,807 annually (three at The Woods School) to $127,549 for a plaintiff at the Benhaven School. This cost, more than $6,000 to more than $10,000 per month, is beyond the means of most, if not all, the parents or advocates of these plaintiffs.

clients are often multiply disabled, thus requiring particularly close attention to their specific and individual needs. Research must be undertaken and reports written. Furthermore, there are far greater limitations on availability of appropriate programs for transfer of TCF recipients than in the college transfer scenario because program needs are derived from the particular disabilities presented by the potential transferee and his or her treatment history. Because of the effort involved, applications are seldom pursued with more than one program at a time. Sometimes appropriate placement can be offered only at a future date. Moreover, parents or advocates have little ability to speed the process.

The TCF program was created in response to just this complexity in locating appropriate placements. In 1983, a subcommittee of the New York State Assembly conducted hearings and issued a report on "The Crisis in Transition," noting that the problem was created by "inadequate transitional planning and the scarcity of services for young adults." "Aging Out: The Crisis in Transition at Age 21 for Disabled Individuals in Need of Adult Services," N.Y.State Assembly Subcomm. on Human Rights, January 14, 1983, at 2, Pltf. Ex. 7. "Nearly every speaker cited the difficulty in obtaining appropriate placements of their young adult clientele, *particularly the multiply-disabled." Id.* at 5. (Emphasis added.) It was then estimated that 1372 individuals would "age out" in 1985, 960 or 70% of whom would require residential placement. The eighteen individuals in TCF status [18] from Suffolk County when the County withdrew in 1995 must be placed against the context of the problem TCF was created to address, including the large numbers of persons "aging out" of educational placements, for whom in-state, adult placements were not available.

In fact, the State made progress in reducing the number of Suffolk County TCF recipients from 1989 to 1995. The number of Suffolk County TCF recipients grew from forty-four in May 1989 to fifty-two in 1990, but had been reduced to eighteen in November 1995, despite the annual additions of persons who "aged-out" of education placements. *Id.* ¶ 23. As of March 1996, the number has been reduced to fourteen, with the State's placement of the four persons on the County's November 1995 list of TCF recipients who had "aged out" in July 1995. Abramowitz Ltr. dated March 8, 1996.

The problem for the plaintiffs before this court, as it was in *Brooks,* is that the funding ended before the process had been completed for *them,* through no fault of their own. For those that had aged-out in prior years, their continued TCF status indicates that their disabilities have been particularly difficult for the State to accommodate in in-state placements.

One thing this history certainly establishes is, that, while it may not require two to three years to accomplish the safe transfer of these fragile individuals, thirty-seven days is insufficient. Safe transfer cannot be, and could not be, accomplished in the thirty-seven days between the County's "official" notification of the termination of funding and its actual cutoff.

### (2)

Dealing with the same problem in *Brooks I* and drawing upon Justice Blackmun's opinion for the majority in *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980), I wrote:

> Here, accurate determination of appropriate placement requires careful review of the plaintiffs' requirements and suitability of proposed placements. Failure to provide such review can lead to the forfeiture of the plaintiffs' interests in humane confinement.

908 F.Supp. at 1153.

The State has pointed out that a claim of deprivation of property without procedural due process must identify the protected property interest, citing *West Farms Associates v. State Traffic Commission,* 951 F.2d 469, 472 (2d Cir.1991). The Second Circuit quoted *Morrissey v. Brewer,* 408 U.S. 471,

---

**18.** There were approximately sixty persons remaining in TCF status when New York City funding ceased in June 1995.

481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972): " 'the nature of the interest [must be] one within the 'liberty or property' language of the Fourteenth Amendment.' " As this court has previously held, the TCF recipients' interest is a liberty interest in humane institutionalization, with conditions and changes determined with the exercise of professional judgment, not a property right or entitlement in any particular state statutory program. The Court of Appeals for the Second Circuit in *Society for Good Will to Retarded Children, Inc. v. Cuomo*, 737 F.2d 1239 (1984), following the Supreme Court in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), has held that once the State made such individuals "dependent on the state, it was required to [house those voluntary residents] in a manner that would not deprive them of constitutional rights." *Good Will,* 737 F.2d at 1246.

In *Brooks I,* I used the analogy of a governmental program supporting dialysis, 908 F.Supp. at 1152, noting that: "[N]o one would seriously argue that the Due Process Clause does not impose an obligation upon a State or Congress to provide reasonable notice to dialysis recipients before terminating funding for those who have relied on that life-sustaining program, so as to allow them the opportunity to obtain alternate access to treatment." These TCF recipients are adults who are incapable of functioning outside of the institutions in which they have resided for years, unless a myriad of support services are provided, if at all. Neither the State nor the County have disputed the necessity of plaintiffs' institutionalization.

Plaintiffs simply cannot make an abrupt transition from institutional life to life on their own, as would result from acceptance of the County's and State's arguments with regard to their non-responsibility. They also cannot make, without planning and support, any transition to another institutional placement that must be found and paid for from public funds. As previously explained, such planning and support cannot be accomplished overnight. It takes months—the State of New York has, in fact, often taken years to accomplish such transitions under TCF. While the State's pace under TCF may not be a model, the history of the difficulty in finding placement for individuals with multiple disabilities in New York State demonstrates that this is not a matter that can be resolved in the thirty-seven day period the County allowed for making the necessary transition after it notified the State, the schools and the plaintiffs on November 24, 1995, following its adoption of its 1996 budget.

Where such liberty interests as those of the plaintiffs are implicated under the Fourteenth Amendment, state actors, including both the State and the County, are obligated to exercise professional judgment in their actions affecting those interests. In *Brooks,* drawing upon the decisions in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) and *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239 (2d Cir.1984), this court held that "due process, at a minimum, requires a 'do no harm' standard. ... [T]he State is obligated to exercise professional judgment to find, and professionally plan transition to, suitable facilities for the individuals still in out-of-state placements." 908 F.Supp. at 1151.

In *Brooks,* this court, also, found an Equal Protection violation in the State's refusal to fund TCF recipients in out-of-state facilities because of its determinative role, both in the plaintiffs' original placement, and in their continuing placement, out-of-state.[19] The State materially assisted in creating the very distinction that then formed the basis for its discrimination in funding while the placements of other persons similarly situated

19. The issue of a possible violation of the Commerce Clause in the discrimination against adult state residents placed in out-of-state institutions has not been raised here, and would probably be foreclosed by the State's right, when acting as a market participant, to discriminate against out-of-state providers. *See White v. Massachusetts Council of Construction Employers, Inc.,* 460 U.S. 204, 103 S.Ct. 1042, 75 L.Ed.2d 1 (1983) (Boston could impose a resident hiring requirement on contracts it funded in whole or in part) and *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) (Maryland could refuse to buy scrapped automobiles from Virginia processors while purchasing from Maryland processors).

*within* the state are fully funded.[20] *See Brooks v. Pataki I,* 908 F.Supp. at 1154.

(3)

There is no question that the State is responsible for these individuals in whose original *and* continued institutionalization it played so material a role. The Second Circuit, in *Society for Good Will to Retarded Children, Inc. v. Cuomo,* 737 F.2d 1239, 1246 (1984), held that constitutionally protected liberty interests were implicated in the institutionalization of the mentally retarded even under voluntary commitment. Nonetheless, the State continues to argue that it has no federal constitutional responsibility to persons voluntarily committed to its care. *See* Abramowitz Ltr. dated March 8, 1996. This view, based heavily on *DeShaney v. Winnebago County,* 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), not only believed by this court to be an unwarranted extension of *DeShaney* to institutionalized persons, but also fails to acknowledge that the plaintiffs' placements are not necessarily to be regarded as "voluntary."

It is true that plaintiffs were placed voluntarily by their parents and local school boards, with the specific approval of the State Department of Education, but they are now adults who have not given consent and are, in fact, incapable of doing so. A voluntary placement does not necessarily retain that character permanently in the face of intervening changes. The Eighth Circuit, in *Kennedy v. Schafer,* 71 F.3d 292, 294 (8th Cir.1995), stated: "We see no reason why a patient originally committed voluntarily must retain that status permanently. Facts change, and legal status follows facts." That court suggested that a reasonable test for testing whether someone is a "voluntary" patient is whether the patient "had the absolute right to leave the hospital by simply requesting to be released." *Id.* at 295.

As a result of their own disabilities, plaintiffs here have no freedom to act in their own behalf. They certainly would not be released if they simply asked to be released. The State—ignoring the irony of the argument—has several times pressed its view that this court would be justified in issuing orders to restrain the *private* institutions at which plaintiffs reside from simply discharging them to another institution or a home-health care arrangement without developing an appropriate discharge plan. Tr. at 38–39. *Brooks* Tr. at 220–22.

Other facts that have changed and affected the plaintiffs' legal status after their original placement are their attainment of adult status at age twenty-one and a change in the governmental entities responsible for them. While plaintiffs were in educational placement before they became twenty-one, their local school district and the State were responsible for the costs of their institutionalization. Once the end of the school year in which they became twenty-one was reached they came under the aegis of TCF and, in the case of the Suffolk plaintiffs, they became the responsibility of OMRDD and Suffolk County. Both governmental entities are thereby constitutionally responsible for their continued institutionalization.

(4)

The State's assumption of responsibility for the plaintiffs was explicit. The OMRDD Long Island DDSO director and deputy director have attributed far greater responsibility to that agency in letters to parents than has been acknowledged by the State in this litigation:

> If [your daughter] has not been placed in an adult residence by the end of the school year, *our office will apply* for transitional funding so that she can remain in her current setting until an adult placement is secured.... To qualify [for TCF], an individual *must* be deemed appropriate to receive services from OMRDD and *must* reside in a program approved under Social Services or Education Law. Transitional funding is administered by the N.Y.S. Department of Social Services with voluntary participation by individual county social services departments.

---

**20.** It should be noted that the State's refusal to fund out-of-state placements does not appear to result from budget pressure—Paul Kietzman of OMRDD stated, in *Brooks,* "I don't think it has to do with the cost to the State, to the State government. I don't think any analysis of that was done." *Brooks* Tr. at 72.

Pltf.Ex. 14, Ltr. dated February 5, 1991 from Ira Zimmerman, Deputy Director, Community Services, Long Island Developmental Disabilities Service Office (DDSO) to parents of Lora Jane Hoops. (Signature page of letter misbound in Ex. 15.) (Emphasis added.)

> With the passage of [the TCF statute] comes specific responsibilities for [OMRDD]. One responsibility is to offer appropriate and available placements in the OMRDD adult care system within the state for young adults who have aged-out of the educational system or social services system.

County Ex. G, Colson Ltr. dated December 4, 1995 to Lenzo. Plaintiffs' eligibility for TCF was conditioned upon State eligibility for institutional services, State approval of the facility in which they resided (at which their acceptance was originally conditioned on State approval, as the cost, now $75,000–130,000 per year, is beyond the means of most families), and their cooperation with State efforts to find adult placements within the state. The State administered the funds that paid, initially half, and subsequent to July 1, 1995, sixty percent, of their cost of care.

The County has asserted that State DSS procedures, from the outset of TCF in 1983, "call for OMH/OMRDD to be the case managers while holding the [locality] responsible as financial managers." Kelsch Aff. dated February 23, 1996 ¶ 25.

This court does not question the constitutionality of a political entity's withdrawal of services previously provided to its citizens. The State has the right under the federal Constitution, as well as under state law, to terminate the TCF program. But, whether categorized as a constitutionally protected liberty interest or a pure procedural due process claim, the State does not have the constitutional right to withdraw from the TCF program without providing the essential due process needed—which in this instance means reasonable notice that would permit the making of alternative arrangements.

The functioning levels and even the very lives of these plaintiffs are at stake in ejection from placements without the exercise of professional judgment in planning for post-ejection circumstances. The State's eagerness to impose this duty on the institutions that currently care for the plaintiffs, on grounds that the institutions are state actors, while it disputes its own responsibility, tacitly recognizes the necessity for this planning, while denying the financial support that is essential.

### (5)

Although it came to its responsibilities later in the plaintiffs' placements than did New York City in *Brooks*,[21] the County does not dispute its extensive involvement in the administration of TCF. It does not claim to have been a passive funding source, but rather claims that it has merely exercised the County's right under State law to withdraw from TCF. It asserts that the warning letters from the County DSS Commissioner in the summer of 1995 were more than adequate notice to the parties that it would withdraw, if it had any duty to warn.

The County details its diligence in oversight of the TCF program. It followed up to assure that the responsible State agency (OMRDD or OMH) made efforts to obtain suitable placements. *Id.* ¶ 27. It executed contracts with the institutions in which the TCF recipients resided, using rates promulgated by the State Departments of Social Services and Education. Kelsch Aff. dated February 23, 1996 ¶ 20. The County has sought to modify the program, by its own report obtaining, in 1991, "Suffolk-only procedures" that require that "all of the individual's assets and resources (not just SSI) be applied to the cost of care, that an application for Services (DSS 2921) be filed, and that application for recertification be made every six months." *Id.* ¶ 28. However, unlike New York City, Suffolk County has never sought judicial assistance to force the State to expedite its transfers of the TCF recipients nor

---

**21.** The County was responsible for the original TCF placements of only one plaintiff. The County became responsible for the other plaintiffs only when they "aged out" of educational placements arranged by local school boards, assuming a responsibility previously that of a local school district within the county.

did it attempt to negotiate a phase-out period with the State.

The County has been understandably frustrated by the seemingly glacial pace of the State's assumption of its responsibilities regarding persons in TCF. The financial disincentive to the State offered by a program in which it, until July 1995, paid only half—and the agencies involved, none—of the TCF recipients' costs of care,[22] while alternative placements would be charged totally to the agency, may have helped to make a difficult task even less appealing to the state agencies.

The Suffolk County Executive has, however, attempted to eliminate TCF from the County Budget at least four times (and possibly six times, if plaintiffs' accounts of 1988 and 1992 efforts are correct), but, until November 1995, never actually did so. In 1989 and 1990 and twice in 1995, the County DSS threatened to cut-off funding for all or part of the program. The first three efforts were rebuffed by the County Legislature. Only on the fourth attempt, with the County's credibility undermined by the abortive earlier attempts, did County DSS actually cut off funds. (As noted, plaintiffs have averred that there were unsuccessful attempts in 1988 and 1992, as well, that were also thwarted by the Legislature.)

These unsuccessful efforts support the conclusion that County DSS has cried "Wolf!" too often to be taken seriously prior to adoption of the County Budget in November 1995. Prior to County DSS Commissioner Wingate's November 24, 1995 letter giving "official notice" to the State that the County Budget for 1996, as adopted, omitted TCF, County DSS had provided notice to the State and to the plaintiffs only that it would, once again, *attempt* to cut off TCF funding. In view of its lack of success in its prior three (possibly five) efforts, and with no further communication undertaken to distinguish this effort from the previous ones, the July 1995 notice cannot be found to be effective notice to either the State or the plaintiffs. This finding is based on Commissioner Wingate's July and November 1995 letters, County Ex. A–E, which, as the County has repeatedly urged, speak for themselves. Tr. at 44, Sklar Ltr. dated March 13, 1996.

Commissioner Wingate's November 24, 1995 letter provided the first "official notice" to the State that eighteen individuals, fourteen of whom had "aged out" prior to 1995, would not be covered by County TCF funding only five weeks later. Neither unilateral action by the County DSS Commissioner in describing his budget plans nor by the County Executive in proposing the budget nor by legislators writing to state officials constitutes the "action" of the County. The State *could* have taken notice of the Executive's intentions as expressed in May and July 1995, but it was not obligated to do so. The past history of the County Executive's attempts to withdraw had taught both the State and the plaintiffs that it was not *over* until it *was* over. The State appears to have given roughly the same importance to the County DSS Commissioner's July notice of intent to withdraw from TCF as it has given to that it received in February 1996 from the Presiding Officer of the Legislature announcing the efforts in the Legislature to restore TCF funding. Both are unilateral actions by a branch of County government with respect to a matter that requires adoption by both branches to become an act of the County.

(6)

The due process obligation of the County is not unlimited. The County's role in TCF was that of financial manager, clearly a lesser role, while the State was responsible for case management. The extent of the County's constitutional obligation to TCF recipients is thus also more limited than is that of the State. "A procedural rule that may satisfy due process in one context may not necessarily satisfy procedural due process in every case." *Bell v. Burson,* 402 U.S. 535, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1971).

The actual conduct of the County and the State with regard to the eight persons who "aged out" of educational placements as of

---

22. Until at least 1995–96, the TCF reimbursement of localities was funded in the budget of the State Department of Social Services rather than in the budgets of its subdivisions, OMRDD and OMH. Budget Memo at 112, *NYCEP* Record on Appeal.

July 1, 1995 indicates a period of transition from local to State responsibility reasonably related to each entity's role. There, despite having given notice to all parties that it would not do so, the County funded new TCF intakes from July 1, 1995 to the earlier of their placement or December 31, 1995, a six month period. There were eight on the County's May 1995 list and four of these new intakes to TCF were on the County's November list. The State has represented, in March 1996, that it has placed all of eight of the 1995 TCF intakes. This means that, in a period of about eight months, it has been able to place the eight Suffolk County TCF recipients who aged out in 1995 in State approved and funded in-state programs. Abramowitz Ltr. dated March 8, 1996.

There is a marked contrast between the precipitous termination of funding by the County at the end of 1995, with only five weeks notice and no effort to facilitate transfers with the six months the County provided, albeit only after threatening to exclude them, for placement of the 1995 new intakes. The November 1995 action of the County also compares unfavorably with the serious TCF phase-out efforts undertaken by New York City, which negotiated a memorandum of understanding with OMRDD and extended a fixed amount of funding for up to six months to assist in obtaining placement of the affected individuals. The County's notice to the State is the critical factor because only the State is able to arrange for the placement of these individuals in State-approved facilities. Failure on the part of a TCF recipient to cooperate with State placement efforts has long been grounds for termination from the program.

(7)

"The purpose of a preliminary injunction is to preserve the status quo pending the final determination of a dispute." *Arthur Guinness & Sons, PLC v. Sterling Publishing Co., Inc.,* 732 F.2d 1095, 1099 (2d Cir.1984); *see, e.g., JSG Trading Corp. v. Tray–Wrap, Inc.,* 917 F.2d 75 (2d Cir.1990). Plaintiffs have met the well-settled standard for a preliminary injunction:

> The standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigating and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

The absence of professional judgment in the abrupt end of Suffolk County's TCF funding demonstrates the existence of "sufficiently serious questions going to the merits" of the alleged constitutional violation to satisfy the first part of the second prong of the standard with respect to the County as well as the State. This makes a fair ground for litigation with a real possibility for success on the merits. *Medical Society v. Toia,* 560 F.2d 535, 538 (2d Cir.1977). The balance of hardships certainly tips toward plaintiffs, whose very functioning is threatened, as opposed to the incremental cost to the County and, if placement is not completed in six months, also to the State, for a true transitional period where, using professional judgment, effort is made by the State to determine, locate and effectuate transfer of plaintiffs to appropriate available placements.

The appearances by a representative for The Woods School, here and in *Brooks,* has again brought to the Court's attention the critical problem faced by the private organizations currently caring for the plaintiffs. The Woods School has not received payment on behalf of the Suffolk County TCF recipients since County funding was discontinued in January 1996. The Woods School and the other institutions are now confronted with a conflict between their ability to care for these individuals and their duty to protect the financial health of their institutions which directly impacts upon their ability to serve others. Both Woods and Devereux, another school serving New York TCF recipients from both Suffolk County and New York City, have already suffered substantial losses from the gap in funding for City placements in the period from June to mid-November 1995 and, thus, are in a weaker position to

subsidize the State and County than they were when the City withdrew.

Moreover, the prospect of irreparable harm is " 'not remote or speculative but ... actual and imminent.' " *Jackson Dairy, Inc.* at 72 (quoting *New York v. Nuclear Regulatory Comm.*, 550 F.2d 745, 755 (2d Cir.1977)). The harm that will be caused to these severely disabled persons by a hasty transfer as the institutions discharge plaintiffs, which they will inevitably be forced to do if funding is not restored, certainly cannot be repaired by money damages. The balance of hardships tips unquestionably in the direction of the plaintiffs. The State's suggestion, both here and in *Brooks*, that these institutions be enjoined to retain their TCF residents without any funding or commitment to expedite transition from the State, may threaten the very existence of these institutions. Tr. at 38–39, *Brooks* Tr. at 220–22. This is particularly mean-spirited treatment for institutions that have been the only ones able to care for TCF recipients when the State could find no other institutions to accept them.

Suffolk County and the State of New York share responsibility for the care and maintenance of these seriously impaired individuals. Suffolk County is entitled to terminate its TCF participation, but it must do so in a way that comports with the Due Process Clause, giving TCF beneficiaries time to obtain alternative care. The State is the entity ultimately responsible under the federal Constitution for the accomplishment (or failure) of any transition to adult placements in a manner that satisfies due process standards.[23] As Judge Brieant held in earlier litigation concerned with severely disabled children:

> A disruption of [these] lives, such as that which would be caused by an abrupt change of [facilities], would be likely so to disturb these [individuals] that many skills, acquired after time and great effort, would become unlearned and lost. Many have been transferred before; shuttled from pillar to post ... At least during the pendency of this lawsuit, such irreparable injury ... must be avoided.

*Stanger v. Ambach,* 501 F.Supp. 1237, 1243 (S.D.N.Y.1980).

This concern was echoed in the legislative history for the TCF statute: "the potential for serious disruptions in care for these young adults, who have less tolerance for disruption than most others in our systems of care, remains higher than is warranted." Memorandum of State Executive Department, re: the 1994 TCF proposal, attached to *NYCEP* Record on Appeal, Ex. G.

### (8)

■ The County and the State object to the grant of a Preliminary Injunction without an evidentiary hearing. Abramowitz Ltr. dated March 8, 1996, Sklar Ltr. dated March 13, 1996. The Second Circuit has, however, held, in *Drywall Tapers and Pointers v. Local 530*, 954 F.2d 69, 76–77 (2d Cir.1992) (brackets in original):

> Although a hearing is generally required on a motion for a preliminary injunction, "*Fengler* does not stand for the proposition that hearing must be held in all preliminary injunction cases." No hearing was necessary here because "the prior hearings and affidavits, and the court's findings supporting the earlier injunction, provided an adequate basis for the court's decision. The most significant factors [on which the injunction was based] ... would have remained essentially unchanged by any additional evidence."

Quoting *Republic of Philippines v. New York Land Co.*, 852 F.2d 33, 37 (2d Cir.1988) citing *Fengler v. Numismatic Americana, Inc.*, 832 F.2d 745 (2d Cir.1987).

No evidentiary hearing is required here because the documents submitted by the County, as it requested, "speak[ ] for themselves." Sklar Ltr. dated March 13, 1996, Tr. at 44.

The County's affidavit and chronology of 1995 TCF budget actions have been relied on by the court in finding that effective notice of withdrawal from TCF to plaintiffs and the State for due process purposes was provided only in late November 1995 after the County

---

**23.** The State litigation has determined that the County is entitled to terminate its participation in the TCF program. *NYCEP*, No. 102684/95 (Sup.Ct.N.Y.County 6/13/95), *aff'd,* —— A.D.2d ——, 632 N.Y.S.2d 531 (1st Dep't 1995).

adopted its 1996 Budget and gave "official notice" of its withdrawal. County Ex. E.

The raison d'etre of TCF was the need for time for transition. The entire history of transitional care clearly establishes that five weeks was an inadequate period in which either plaintiffs or the State could act to protect plaintiffs' liberty interest in institutional conditions determined by the exercise of professional judgment. The parties have amply briefed and argued the history of the Transitional Care Funding program here, both directly and by reference from *Brooks*. The defendants' dispute with my ruling is based on its conclusions of the law, not of my factual findings.

Here very little "turns on [disputes about] what happened." Were that not true, the holding that "'where everything turns on what happened and that is in sharp dispute; in such instances, the inappropriateness of proceeding on affidavits attains its maximum.'" *Forts v. Ward*, 566 F.2d 849, 852 (2d Cir.1977), quoting *Dopp v. Franklin National Bank*, 461 F.2d 873, 879 (2d Cir.1972), quoting *Securities and Exchange Comm'n v. Frank*, 388 F.2d 486, 491 (2d Cir.1968) would clearly mandate a hearing. This principle is, however, simply inapplicable here.

Moreover, the County's position is disingenuous. On the one hand, the County protests against the State's submission of a letter from the Presiding Officer of the Legislature to an OMRDD official, arguing that it is not bound by such a letter. Sklar Ltr. dated March 13, 1996. Yet, at the same time, the County is arguing that the State should have assumed that the County was serious when it announced its withdrawal in the equally non-definitive letters of the County DSS Commissioner in May and July 1995. Even if the State officials seriously believed the County Executive was in earnest, they, too, based on the repeated history of the Executives efforts to end the program, appropriately awaited action by both governmental branches. They awaited, as the County asserts they should have, "the will of [the] legislature." *Id.*

Official acts of the County Executive and the County Legislature, disputed by no party, are the basis for this order to Suffolk County. Similarly, the undisputed history of joint State and County involvement in TCF and State responsibility for case management provides clear support for dividing responsibility for phase-out of TCF between the two levels of government while placing ultimate responsibility on the State if it fails to complete transition during that phase out period. The circumstances, therefore, fully satisfy the requirements for issuance of a preliminary injunction.

### Conclusion

The court grants the plaintiffs' motion for a preliminary injunction, orders Suffolk County to resume funding the TCF recipients' placements, including arrears to January 1, 1996, for a period of six months from the date of this order, so as to provide TCF recipients and the State the opportunity to arrange alternative care in an orderly manner. The State has represented that it will honor its commitment under TCF to reimburse the County for sixty percent of the cost. Tr. at 43–44. The State is ordered to use all good efforts, using professional judgment, to assist the plaintiffs in obtaining appropriate alternative care. The State will assume the burden of funding any remaining TCF placements at the end of this six-month period. Failure of any plaintiff to cooperate with reasonable requests related to developing placement plans or to accept an appropriate placement, shown by the State or County to the satisfaction of this court, is grounds for termination of the interim funding for that individual under this order.

SO ORDERED.