101 F.3d 818
 SUFFOLK PARENTS OF HANDICAPPED ADULTS; Irene Hoops; Frank
Gatland; Frances Sensale Lenzo; Joyce B. Aron; Lillian
Melville Hamid; Margaret Devoe; Jane Doe; Rachel Roe;
Lora Hoops; Andrew Gatland; James Sensale; Lourdes Aron;
Glenna Hamid; Karen Devoe; Richard Roe, as parents and
guardians of, respectively, Lora Hoops; Andrew Gatland;
James Sensale; Lourdes Aron; Glenna Hamid; Karen Devoe;
John Doe, and Rachel Roe, Plaintiffs-Appellees,
v.
John B. WINGATE, as Commissioner of the Suffolk County
Department of Social Services and Suffolk County; George
Pataki, as Governor of the State of New York; Robert J.
Gaffney, as County Executive of Suffolk County; Thomas A.
Maul; James L. Stone and Brian Wing, Defendants-Appellants.
 No. 2224, Dockets 96-7421, 96-7470, 96-7630.
 United States Court of Appeals,
Second Circuit.
 Argued June 24, 1996.
Decided Nov. 4, 1996.
As Amended on Denial of Rehearing Dec. 9, 1996.
 
 William J. Burke, New York City, Thomas Coval, Willow Grove, PA (Lisa K. Friedman, New York City, Robert M. Freedman, Freedman & Fish, New York City, of counsel), for Plaintiffs-Appellees.
 Amy L. Abramowitz, Assistant Attorney General, New York City (Dennis C. Vacco, Attorney General of the State of New York, Barbara G. Billet, Deputy Solicitor General, New York City, of counsel), for Defendants-Appellants Pataki, Maul, Stone, and Wing.
 James M. Catterson, Deputy County Attorney, Hauppauge, NY (Robert J. Cimino, Suffolk County Attorney, Theodore D. Sklar, Thomas M. Merritt, Assistant County Attorneys, Hauppauge, NY, of counsel), for Defendants-Appellants Gaffney, Wingate, and Suffolk County.
 Before: MINER, JACOBS, and PARKER, Circuit Judges.
 JACOBS, Circuit Judge:
 
 
 1
 The United States District Court for the Eastern District of New York (Trager, J.) entered a preliminary injunction which provided, inter alia, that (1) defendant Suffolk County must pay for the out-of-state residential care of four severely disabled adults for up to six months, or until they complete an orderly transition to appropriate in-state care; and (2) if any of these four individuals remain in out-of-state facilities after six months, defendant state officials must assume responsibility for their care until such an orderly transition is completed. In light of our recent decision in Brooks v. Giuliani, 84 F.3d 1454 (2d Cir.1996), reh'g denied, No. 95-9178 (2d Cir. Aug. 7, 1996), cert. denied, --- U.S. ----, 117 S.Ct. 480, 136 L.Ed.2d 375 (1996), and our rulings in this opinion, we vacate the injunction and remand.
 
 BACKGROUND
 
 2
 The plaintiffs are the guardians of four severely disabled individuals over the age of 21 who are residents of Suffolk County, New York; and Suffolk Parents of Handicapped Adults, an unincorporated association which includes plaintiffs' guardians as members.[1] (For ease of reference, "plaintiffs" hereinafter refers to the four disabled individuals on whose behalf the named plaintiffs brought this suit.) The defendants are Suffolk County and two of its officials (collectively, "Suffolk County") and certain officials of New York State (the "State Defendants").[2]
 
 
 3
 When the plaintiffs were children, Suffolk County's local school boards placed them in out-of-state facilities for residential care, because no appropriate in-state facilities were available. These placements, made in each instance with State approval, were arranged for the purpose of complying with the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, et seq. (formerly the Education of the Handicapped Act) and New York State Education Law ("Education Law") §§ 4001-4006, 4401-4410 (McKinney 1995). Collectively, these statutes entitle all physically and mentally disabled children in New York to a free education, suitable to their needs, and require localities to contract with residential facilities in other states if facilities appropriate to a particular child's needs are not available in-state. See, e.g., Education Law §§ 4002(1), 4407(1)(a).
 
 
 4
 Although plaintiffs' out-of-state placements were fully supported by federal and state funding, that funding ended once the plaintiffs turned 21 and "aged out" of the IDEA-mandated regime. Suffolk County, like other New York State counties, voluntarily assumed responsibility for the costs of plaintiffs' out-of-state care when they turned 21; this provision of funding is known as "Transitional Care Funding" ("TCF"). State agencies paid, and continue to pay, 100% of the costs of care for individuals who reside at facilities in-state.
 
 
 5
 From 1982 through 1994, New York State reimbursed counties for 50% of the costs of TCF. In the absence of substantive legislation addressed to this need, the State's 50% contribution was provided each year through an earmarked appropriation in the State's Aid to Localities Budget. In 1994, New York State enacted a statute, effective January 1, 1995 (the "TCF Statute"), that placed these arrangements on a different footing. The TCF Statute increased the State's reimbursement of TCF costs to counties from 50% to 60%; mandated an eventual phase-out of all out-of-state placements; and provided that (if the phase-out was not accomplished) the State would assume 100% of the costs of out-of-state placements by 1999 for those still remaining in such placements. See N.Y. Soc. Serv. Law § 466(2), (5), (6) (McKinney Supp.1996).
 
 
 6
 Prior to 1996, Suffolk County provided TCF for the plaintiffs and other individuals. However, the county executive had repeatedly tried to omit TCF from the county budgets for the years 1989 through 1995; each time, that effort was thwarted by the county legislature. But in November 1995, the county legislature voted to omit TCF from the 1996 county budget; soon after, the County notified the State that it would not provide TCF for 1996. Since State assistance is a reimbursement mechanism for expenditures made by the counties, Suffolk County's refusal to provide TCF meant that the State would also cease to contribute to the plaintiffs' TCF costs.
 
 
 7
 On January 23, 1996, the plaintiffs commenced this § 1983 action in the district court alleging violations of procedural due process, substantive due process, equal protection, and other "constitutional dut[ies]," and seeking restoration of TCF until the plaintiffs effect an orderly transition into appropriate in-state facilities. On February 21, 1996, the plaintiffs moved for a preliminary injunction. In an opinion issued April 4, 1996, the district court granted a preliminary injunction providing that, inter alia, (1) Suffolk County must resume payment of TCF for six months (of which the State would reimburse 60%, pursuant to its statutory undertaking), during which time the State Defendants are ordered to "use all good efforts, using professional judgment," to assist the plaintiffs in transferring to appropriate in-state facilities in an orderly manner; and (2) if any of the plaintiffs remain in out-of-state placements after six months, the State Defendants must assume the full burden of funding those placements until the transfers are completed. See Suffolk Parents of Handicapped Adults v. Pataki, 921 F.Supp. 970, 986 (E.D.N.Y.1996). In an opinion issued May 2, 1996, the district court granted in part and in part denied Suffolk County's motion for a stay of the injunction pending appeal,[3] but clarified the injunction in one crucial respect: the court ordered that, following the six-month period for which the County is responsible for TCF, or should the County prevail on appeal, the State Defendants must "take all necessary steps"--including providing 100% of TCF for the plaintiffs still residing in out-of-state placements--until appropriate transfers are made to in-state facilities. Suffolk Parents of Handicapped Adults v. Pataki, 924 F.Supp. 431, 443 (E.D.N.Y.1996).
 
 
 8
 On May 14, 1996, this Court granted Suffolk County's motion for a stay of the district court's injunction as to the County. On May 17, 1996, consistent with its previous ruling, the district court ordered the State Defendants to assume responsibility for 100% of TCF until the plaintiffs are transferred to appropriate in-state facilities. No. CV-96-0288 (DGT), 1996 WL 285423, at * 2 (E.D.N.Y. May 17, 1996).
 
 DISCUSSION
 
 9
 Generally speaking, a court should not grant a preliminary injunction unless the party seeking the injunction demonstrates (1) irreparable harm and (2) either (a) a likelihood of success on the merits or (b) "sufficiently serious questions" on the merits and a balance of hardships that "tip[s] decidedly" in the movant's favor. Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir.1979) (per curiam). We have held, however, that "[w]here the moving party seeks to stay government action taken in the public interest pursuant to a statutory or regulatory scheme," the district court should not apply the less stringent "serious questions" standard, but should instead require the movant to satisfy "the more rigorous 'likelihood of success' standard...." Able v. United States, 44 F.3d 128, 131, 132 (2d Cir.1995) (quoting Plaza Health Lab., Inc. v. Perales, 878 F.2d 577, 580 (2d Cir.1989) (internal quotations omitted)); see also, International Dairy Foods Assoc. v. Amestoy, 92 F.3d 67, 70 (2d Cir.1996). Judge Trager recognized that "the more demanding standard of 'likelihood of success on the merits[ ]' ]' " applied to plaintiffs' case, but concluded that "plaintiffs have clearly met that more stringent standard." Suffolk, 924 F.Supp. at 441. We agree that this stricter standard applies here.
 
 
 10
 We review for abuse of discretion a district court's grant of a preliminary injunction. Blum v. Schlegel, 18 F.3d 1005, 1010 (2d Cir.1994). An abuse of discretion may be demonstrated by showing that the injunction is based on an error of law. County of Seneca v. Cheney, 12 F.3d 8, 11 (2d Cir.1993). For reasons explained below, we hold that the district court committed such an error of law in granting the injunction, thereby abusing its discretion. We therefore vacate the preliminary injunction and remand.
 
 
 11
 The district court's opinion relies chiefly upon the Fourteenth Amendment's Due Process Clause; and we address that ground first. The district court also may have considered plaintiffs' argument that the Fourteenth Amendment's Equal Protection Clause provided an alternative ground for granting the injunction. We address the equal protection ground second.
 
 
 12
 A. Due Process.
 
 
 13
 The district court concluded, relying chiefly on Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), and Society for Good Will to Retarded Children, Inc. v. Cuomo, 737 F.2d 1239 (2d Cir.1984), that the plaintiffs had "a liberty interest in humane institutionalization, with conditions and changes determined with the exercise of professional judgment," and that this liberty interest is protected by the Due Process Clause of the Fourteenth Amendment. Suffolk, 921 F.Supp. at 980. As to Suffolk County, the court ruled that it "is entitled to terminate its TCF participation, but it must do so in a way that comports with the Due Process Clause, giving TCF beneficiaries time to obtain alternative care." Id. at 985. The County's "abrupt end" of TCF payments, according to the district court, showed an "absence of professional judgment" that presented " 'sufficiently serious questions going to the merits' " of the plaintiffs' constitutional claim. Id. at 984 (quoting Jackson Dairy, 596 F.2d at 72). The preliminary injunction therefore required Suffolk County to resume TCF payments for another six months, so that the County could eventually withdraw from TCF obligations while still affording the plaintiffs time to find alternative placements. Id. at 986.
 
 
 14
 Turning to the State Defendants, the district court recognized that New York State "has the right under the federal Constitution, as well as under state law, to terminate the TCF program." Id. at 982. The court held, however, that "the State does not have the constitutional right to withdraw from the TCF program without providing the essential due process needed--which in this instance means reasonable notice that would permit the making of alternative arrangements." Id. Since the district court found that "[t]he State is the entity ultimately responsible under the federal Constitution" for making sure that the plaintiffs' transfers comported with due process, id. at 985, the court provided in its injunction that the State Defendants must assume sole responsibility for the plaintiffs' TCF and orderly transfers to in-state placements, when and if Suffolk County's obligations end. Id. at 986. The State Defendants represented to the district court that New York State would continue making partial reimbursement of Suffolk County's TCF payments, whether those payments are voluntary or compelled by the district court. Id. at 986; Suffolk, 924 F.Supp. at 436. The State Defendants object, however, to the court's ruling that they must be responsible for the plaintiffs' TCF and orderly transfers if and when Suffolk County is permitted to stop paying for TCF.
 
 
 15
 This issue is controlled by our recent decision in Brooks v. Giuliani, 84 F.3d 1454 (2d Cir.1996), reh'g denied, No. 95-9178 (2d Cir. Aug. 7, 1996), cert. denied, --- U.S. ----, 117 S.Ct. 480, 136 L.Ed.2d 375 (1996), which was issued after the injunction was entered in this case, and which arose from the decision by New York City (like Suffolk County) to end TCF for severely disabled adults who were living in out-of-state care facilities. Id. at 1457-58. The Brooks plaintiffs, however, first sued the City and the State in the New York State courts. The state courts held that neither the City nor the State had any obligation, under either New York statutory law or New York's constitution, to maintain TCF. Id. at 1459; see New York Council for Exceptional People v. Pataki, No. 102684/95, slip op. at 9 (N.Y. Sup.Ct. N.Y. County June 13, 1995), aff'd, 220 A.D.2d 236, 632 N.Y.S.2d 531 (1st Dep't 1995) (mem.), appeal denied, 87 N.Y.2d 809, 642 N.Y.S.2d 195, 664 N.E.2d 1258 (1996). The Brooks plaintiffs then brought suit in federal court, also before Judge Trager, to obtain the relief that they were denied in state court. The district court granted a preliminary injunction that required the defendant New York State officials to maintain TCF payments for the Brooks plaintiffs until they were transferred to in-state facilities. 84 F.3d at 1462. On appeal, we held that since the plaintiffs had the opportunity to seek the same relief in their state court proceedings, many of their claims were barred by res judicata. Id. at 1463-64.
 
 
 16
 One due process claim in Brooks, however, was not barred by res judicata, because it arose from events that postdated the state court litigation. In Brooks, as in this case, the district court relied on Youngberg and Society for Good Will for the proposition that the plaintiffs had a due process right to " 'professional judgment' in establishing safe conditions and freedom from undue restraint" and " 'professional judgment in devising programs that seek to allow patients to live as humanely and decently as when they entered the school.' " Id. at 1465-66 (quoting Brooks v. Pataki, 908 F.Supp. 1142, 1150-51 (E.D.N.Y.1995)). We held that the Brooks plaintiffs had no right under the Due Process Clause to any continued payments for TCF by the defendant state officials. Id. at 1466-67.
 
 
 17
 " '[T]he Due Process Clause[ ] generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual.' " Id. at 1466 (quoting DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 196, 109 S.Ct. 998, 1003, 103 L.Ed.2d 249 (1989)). The Brooks plaintiffs, who had no entitlement to TCF payments under New York law, could not find an independent source of entitlement in the Due Process Clause. The Supreme Court identified only a single exception to this rule: " 'when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.' " Id. (quoting DeShaney, 489 U.S. at 199-200, 109 S.Ct. at 1005 (emphasis added)). We concluded that the district court's reliance on Youngberg was misplaced, because in Youngberg the institutionalized individuals had been involuntarily committed. Id. We further concluded that Society for Good Will was distinguishable, because in that case the State's obligation to provide some quantum of care and funding was undisputed. Id. Since the Brooks plaintiffs were not involuntarily institutionalized, we held that "the [preliminary] injunction cannot be premised on a duty to 'exercise professional judgment' under Youngberg and Society for Good Will, because there is no such duty here." Id. at 1467.
 
 
 18
 In the present case, the preliminary injunction is premised solely on the same "obligat[ion] to exercise professional judgment" that the district court imposed in Brooks and that we subsequently rejected. Suffolk, 921 F.Supp. at 980 (citing Youngberg, Society for Good Will, and Brooks v. Pataki, 908 F.Supp. at 1151) (internal quotations omitted). The district court specifically rejected the State Defendants' reliance on DeShaney, in part by finding that "the plaintiffs' placements are not necessarily to be regarded as 'voluntary.' " Id. at 981. The district court recognized that the plaintiffs, as children, "were placed voluntarily by their parents and local school boards"; but the court concluded that, since the plaintiffs "are now adults who have not given consent and are, in fact incapable of doing so," they were being institutionalized involuntarily within the meaning of DeShaney. Id. In support of this conclusion, the district court asserted that the plaintiffs "would not be released if they simply asked to be released." Id. Nothing in the record supports this conclusory statement. In the first place, neither the County nor the State has custody of the plaintiffs. And neither government would be funding the plaintiffs' institutionalization but for the district court's injunction. Both Suffolk County and the State Defendants strenuously disavow any interest in preventing the plaintiffs' departure from their out-of-state institutions. If the point of the district court's finding is that the private residential institutions in which the plaintiffs live would require a guardian's consent before acceding to a residential patient's request to leave, that is not relevant to any restraint imposed by the County or the State. As the State Defendants argue: "to the extent plaintiffs themselves could not 'simply request their own release,' their parents or guardians are authorized to make such requests for their release." State Defendants' Brief at 17. Thus, as in Brooks, this is not a case where the defendants have attempted to exert or maintain custody over the plaintiffs; on the contrary, "[t]he whole effort of the guardians ... has been to prolong the involvement of [the County] and the State in the funding of institutional placements as to which [the County] and the State have washed their hands." Brooks, 84 F.3d at 1466.
 
 
 19
 In sum, the plaintiffs here, like the plaintiffs in Brooks, are not involuntarily institutionalized. The plaintiffs here have no entitlement under New York law to TCF funding from either Suffolk County or the State Defendants. New York Council for Exceptional People, slip op. at 9. Nor can they claim any such entitlement from any of the defendants under the Due Process Clause of the Fourteenth Amendment. Brooks, 84 F.3d at 1465-67. That being the case, the district court's preliminary injunction was premised on an error of law, and, consequently, was an abuse of discretion. County of Seneca, 12 F.3d at 11.
 
 
 20
 B. Equal Protection.
 
 
 21
 Although the district court's opinion alludes only briefly to "an Equal Protection violation in the State's refusal to fund TCF recipients in out-of-state facilities," Suffolk, 921 F.Supp. at 980, the complaint raises an equal protection argument, and both parties referenced the issue (without pressing it) in their briefs. At oral argument, plaintiffs requested that we consider equal protection as an alternative basis for the district court's injunction, and we invited the parties to submit supplemental briefing on that point.
 
 
 22
 Plaintiffs' equal protection claim posits that the State, by placing some handicapped children in out-of-state facilities and placing others in-state, divided into two groups a single class of severely disabled people--whom plaintiffs claim are "a protected class"--and then used that very division to justify dissimilar treatment, by way of a funding cut-off, for those initially placed out-of-state. Plaintiffs acknowledge that their initial placement out-of-state as children "did serve the legitimate state function of providing care for its severely disabled citizens," but they contend that "[u]nconstitutional conduct occurred ... when a part of the disabled group was stripped of funding ... by [the State's] reaction to county withdrawal from the TCF program." The thrust of plaintiffs' argument is summarized in the passage they quote from the opinion of the district court: "The State materially assisted in creating the very distinction that then formed the basis for its discrimination...."[4] Suffolk, 921 F.Supp. at 980.
 
 
 23
 It is elemental that "disparate treatment is not necessarily a denial of the equal protection guaranteed by the Constitution" ; rather, the Supreme Court has afforded "wide discretion ... to the states in establishing acceptable classifications." Quill v. Vacco, 80 F.3d 716, 725 (2d Cir.1996). In particular, states "must have substantial latitude to establish classifications that roughly approximate the nature of the problem perceived, that accommodate competing concerns both public and private, and that account for limitations on the practical ability of the State to remedy every ill." Id. (emphasis added) (quoting Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394-95, 72 L.Ed.2d 786 (1982)). The general rule, therefore, is that "state legislation or other official action that is challenged as denying equal protection ... is presumed to be valid and will be sustained if the classification drawn ... is rationally related to a legitimate state interest." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985); see also Quill, 80 F.3d at 725.
 
 
 24
 Plaintiffs (and the district court) erroneously focus on the withdrawal of funding as the juncture at which "[u]nconstitutional conduct occurred." This approach, however, collapses the analysis and ignores the events and programs that created the funding disparity. The distinction between individuals placed in-state and those placed out-of-state was first made when the County and State, acting together in compliance with the IDEA and the State Education Law, placed the plaintiffs (as children) in out-of-state residential care facilities because no appropriate facilities were available in-state.[5]
 
 
 25
 This initial differentiation between groups of disabled citizens was never challenged on equal protection grounds, and was unquestionably a rational act in pursuit of legitimate ends--the placement of each individual where that individual's singular needs could best be served. Indeed, plaintiffs concede that "[t]he initial placement out-of-state did serve the legitimate state function of providing care for its severely disabled citizens. As there were insufficient appropriate facilities in-state, New York properly found and funded placements in nearby states." Thus the State's classification "carries a presumption of validity," because it was admittedly " 'rationally related to a legitimate state interest' " when implemented. Quill, 80 F.3d at 725 (quoting Cleburne, 473 U.S. at 440, 105 S.Ct. at 3254).
 
 
 26
 We therefore accept that the initial difference in treatment had a rational basis, and turn to the more troublesome question of whether there is a rational basis for the programs that create the disparity in New York State's funding of care for disabled adults. (There can be no equal protection claim against Suffolk County, which now pays nothing for any of its disabled adults, and indeed the plaintiffs have made no such claim.)
 
 
 27
 The State asserts that it has a rational basis for funding only in-state residential programs that it can license, certify, and oversee, and through which it can effectively regulate the care given to its disabled citizens. We agree that the State does have a legitimate interest in regulating the treatment programs and residential care facilities for which it pays and in which its disabled adult citizens are placed.[6] The agencies charged with administering the State's programs, however, have no authority to regulate the facilities in neighboring states where the plaintiffs now live.[7]
 
 
 28
 Unfortunately, there appear to be no placements available in New York for these plaintiffs. They have multiple, profound disabilities, and have special needs requiring particular services that are not everywhere available. The complaint alleges, for example, that plaintiffs "cannot receive adequate care in at-home programs," but "require institutionalization, or supervised care." See also Suffolk, 921 F.Supp. at 972 ("There is no dispute ... that the plaintiffs' disabilities are severe nor that plaintiffs require institutionalization."); id. at 980 ("These TCF recipients ... are incapable of functioning outside of the institutions in which they have resided for years, unless a myriad of support services are provided, if at all."). The appalling fact is that there is a limited capacity in New York State for the care and treatment of people who are as severely disabled as plaintiffs. According to the State, there currently is a waiting list of over 5,000 individuals who are seeking adult residential placements within the system administered by New York's Office of Mental Retardation and Developmental Disabilities ("OMRDD"). Plaintiffs concede that "no facilities appropriate for the [disabled adults] were available within New York State ... to meet the[ir] special and unique needs...." See also Suffolk, 921 F.Supp. at 979 (noting the great "limitations on availability of appropriate programs for transfer of TCF recipients" and the State's "difficulty in obtaining appropriate placements [for] their young adult clientele, particularly the multiply-disabled") (citation and internal quotation omitted).
 
 
 29
 A waiting list for a program with limited capacity is not itself a violation of equal protection.[8] Here, plaintiffs concede that rational and fair educational decisions taken by the State (and others) have resulted in their being excluded temporarily from New York's fully-funded program for in-state disabled adults.
 
 
 30
 The State has also adopted a program for severely disabled adult citizens who reside temporarily in out-of-state institutions. That program, involving the partial reimbursement of counties' expenditures for TCF, resembles many legislative or regulatory schemes in which a state offers partial funding of a program as an inducement for its counties or municipalities to participate--and of course the federal government gives similar incentives to the states. The decision by a state not to participate in a federal program that would benefit a class of its citizens is not a denial of equal protection to those individuals relative to persons similarly situated, but resident in participating states. By the same token, the disabled adults from Suffolk County who were placed in out-of-state facilities are not being denied their rights to equal protection by New York State simply because Suffolk County has elected not to accept the State's offer of reimbursement under the TCF program.[9] As this Court has recently stated in a similar context, New York's program may well be "bad public policy," but it "does not violate the Equal Protection Clause." Catlin v. Sobol, 93 F.3d 1112, 1121 (2d Cir.1996).
 
 
 31
 In summary, (a) New York had a rational basis for placing some of its disabled children in schools within the state while placing others outside the state, wherever the State's duty to provide an education could best be carried out; (b) New York now has a rational basis for a program that funds the care only of those individuals who are institutionalized in New York State; and (c) New York has a rational basis for reimbursing counties that voluntarily undertake to fund the care of their residents who are institutionalized out-of-state. A disparity results from all of this, but an equal protection violation does not.[10]
 
 CONCLUSION
 
 32
 For the reasons set forth above, we vacate the preliminary injunction of the district court and remand.
 
 PARKER, Circuit Judge, concurring:
 
 33
 I concur in the due process section of this opinion, despite my earlier dissent in Brooks v. Giuliani, 84 F.3d 1454, 1468 (2d Cir.), reh'g denied, No. 95-9178 (2d Cir. Aug. 7, 1996) because I believe that case to be completely controlling of this one on that issue. I also join the remainder of the opinion.
 
 
 
 [1]
 The complaint was filed by six named plaintiffs and "Jane Doe" and "Richard Roe." As the district court has noted, two of the named plaintiffs, who were the guardians of two disabled individuals, have withdrawn from the suit. Suffolk Parents of Handicapped Adults v. Pataki, 921 F.Supp. 970, 972 n. 3 (E.D.N.Y.1996). The complaint alleges that "Jane Doe and Richard Roe ... represent[ ] additional parents and guardians listed in Schedule A hereto." There is no "Schedule A" to the complaint reprinted in the Joint Appendix, and, apparently, no such schedule was before the district court. See id. at 972 & n. 3 (noting that "[t]he present action involves four ... plaintiffs" but that "[o]riginally there were six plaintiffs")
 
 
 [2]
 The county officials are Robert J. Gaffney, County Executive, and John B. Wingate, Commissioner of the Department of Social Services. The state officials are George E. Pataki, Governor; Thomas A. Maul, Commissioner of the New York State Office of Mental Retardation and Developmental Disabilities (the "OMRDD"); James L. Stone, Commissioner of the New York State Office of Mental Health (the "OMH"); and Brian Wing, Commissioner of the New York State Department of Social Services (the "DSS")
 
 
 [3]
 The district court granted the portion of Suffolk County's motion that requested a stay with respect to the payment of arrears. See Suffolk Parents of Handicapped Adults v. Pataki, 924 F.Supp. 431, 443 (E.D.N.Y.1996)
 
 
 [4]
 We reject plaintiffs' suggestion that they be treated as a "protected class" for purposes of equal protection analysis. The Supreme Court specifically refused to recognize the mentally disabled as a "quasi-suspect" class in City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 442-46, 105 S.Ct. 3249, 3255-58, 87 L.Ed.2d 313 (1985). Likewise, Judge Trager concluded in his recent decision in the related case of Westchester Advocates for Disabled Adults v. Pataki, 931 F.Supp. 993 (E.D.N.Y.1996), that, under our analysis in Quill v. Vacco, 80 F.3d 716, 725-27 (2d Cir.1996), questions involving the provision of TCF to disabled individuals "fall[ ] within the category of social welfare legislation and [are] subject to rational basis scrutiny." 931 F.Supp. at 1010; see also, Catlin v. Sobol, 93 F.3d 1112, 1120 (2d Cir.1996) (applying rational basis review, and not intermediate scrutiny, to equal protection claim involving provision of education to mentally retarded). Moreover, this case involves different treatment between two groups of similarly disabled individuals, not a differentiation between people with--and people without--disabilities
 
 
 [5]
 According to plaintiffs, their "due process analysis begins with state placement ... in childhood," while their equal protection claim "points to invidious differences ... once the threat of funding cutoff becomes a reality." (Emphasis added.)
 
 
 [6]
 See, e.g., Catlin v. Sobol, 93 F.3d 1112, 1120 (2d Cir.1996) (citing Martinez v. Bynum, 461 U.S. 321, 328, 329, 103 S.Ct. 1838, 1842-43, 1843, 75 L.Ed.2d 879 (1983)) (agreeing that New York State has a "legitimate interest[ ] [in] reserving services for bona fide residents and preserving local control over educational services")
 
 
 [7]
 The State Defendants point out that, under the mandatory educational placement scheme established by the IDEA and State Education Law, the State has express statutory authority to make and supervise the out-of-state placements of its disabled children. See, e.g., Education Law Art. 81, 89
 
 
 [8]
 No one is suggesting that the disabled individuals currently in New York's fully-funded in-state program be displaced. As the plaintiffs assert in the complaint, disabled adults in residential placement lead a precarious existence requiring delicate treatment: because they (presumably) "receiv[e] appropriate care in their present facilities" and "have been in those facilities since early childhood," these individuals "have become accustomed to those facilities and have bonded with their caregivers." Complaint pp 17, 18. As a result of "their extreme fragility, both physical and mental, all [such disabled adults] face severe trauma and potential regression if removed from their present facilities." Id
 
 
 [9]
 The preliminary injunction entered by the district court in this case radically impairs the interim funding scheme of the State's TCF statute. If the State's obligations were as the district court held them to be, the partial reimbursement mechanism designed to induce counties to pay TCF would fail altogether, because every New York county would know that its non-participation and willingness to forgo the State's offer of 60% funding would merely trigger a 100% funding obligation on the part of the State
 
 
 [10]
 In addition to its argument that the district court's due process analysis was erroneous, Suffolk County contended that (1) the district court wrongly substituted its judgment for that of the county in local budgetary matters; (2) the court misapplied the standards for injunctive relief; and (3) the court's injunction effectively granted the plaintiffs summary judgment without notice to the defendants. In light of our holding that the district court's due process and equal protection analyses were erroneous, we do not address these other contentions
 Suffolk County also claimed that the court displayed a bias in the plaintiffs' favor that mandated recusal. We find this argument to be without merit.