**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**Göran HEDÉN, Per Isacsson, Johan Schelin, Anders Johansson and Per Snarberg, Defendants,**

**Anita Isacsson, Bengt Hedén and Ruth Ingalill Hedén, Relief Defendants.**

**No. 99 CIV. 1418(SAS).**

United States District Court, S.D. New York.

May 28, 1999.

Paul V. Gerlach, Peter H. Bresnan, Linda Chatman Thomsen, Timothy N. England, Timothy D. Belevetz, Washington, DC, for plaintiff Securities and Exchange Commission.

Mark S. Cohen, Arkin, Schaffer & Kaplan, L.L.P., New York City, for relief defendants Bengt and Ruth Ingalill Hedén.

Richard J.J. Scarola, Scarola & Reavis, New York City, for relief defendant Anita Isacsson.

Peter M. Herlitz, Advokat-Firman Carler, Stockholm, Sweden, for non-party Magnus Brundin.

John Pizzimenti, Brown Brothers Harriman, & Co., New York City, for accounts at issue.

### *AMENDED OPINION AND ORDER*

SCHEINDLIN, District Judge.

Plaintiff Securities and Exchange Commission ("SEC") seeks a preliminary injunction freezing the profits and principal investment of a securities trade that allegedly violated §§ 10(b) and 14(e) of the Exchange Act, 15 U.S.C. §§ 78j(b), 78n(e). The SEC contends that an asset freeze is required to ensure that sufficient funds remain in the United States to satisfy any final judgments the Court might enter in this case ordering disgorgement of profits or civil penalties. The SEC's Second Amended Complaint alleges that five Swedish citizens, Göran Hedén, Per Isacsson, Johan Schelin, Anders Johansson and Per Snarberg ("the Defendants"),[1] purchased stock in an American corporation,

---

1. On April 28, 1999, the SEC amended its complaint for a second time withdrawing its claims against another defendant, Magnus Brundin. As a result, the SEC requests that the Court discontinue the temporary asset freeze of the proceeds of Brundin's sale of Pinkerton stock.

Pinkerton, Inc., one trading day before its acquisition by Securitas AB, a Swedish corporation, was publicly announced. Under the terms of the acquisition, Pinkerton stockholders were to receive $29 per share, a 72% premium over the $16.88 closing price the day before the announcement. Defendants purchased 15,000 shares of Pinkerton for approximately $250,000. The next trading day, the price rose approximately $12 per share, producing profits of approximately $175,000 for defendants. *See* Declaration of Richard Scarola ("Scarola Decl."), counsel for relief defendant Anita Isacsson, dated May 11, 1999, Ex. D; Declaration of Peter Bresnan ("Bresnan Decl."), counsel for the SEC, dated April 21, 1999, Ex. 26.

The SEC contends that two defendants, Per Isacsson and Göran Hedén, traded through two brokerage accounts registered in the name of their parents, relief defendants Anita Isacsson and Bengt and Ruth Ingalill Hedén (The "Hedén Family Account"). On February 24, 1999, the Court granted a Temporary Restraining Order freezing the profits and principal invested in Pinkerton stock traded by defendants through these two accounts. In order to allow additional time for discovery, the parties agreed to several extensions of the temporary freeze which expires May 21, 1999. An evidentiary hearing was held on April 22, 1999. Oral argument occurred on May 18, 1999, and the SEC and defense counsel have both fully briefed the issue. For the following reasons, the SEC's request to freeze the profits and principal credited to the Hedén Family Account and the profits from the sale of Pinkerton stock credited to Anita Isacsson's Account is granted. However, the Court declines to freeze the assets credited to Anita Isacsson's Account representing the principal investment.

## I. Legal Standard for Preliminary Injunction Freezing Assets

Relief defendants concede that the SEC may obtain a freeze of defendants' assets to cover any allegedly ill-gotten profits or any penalty that may become due after trial on the merits. Relief defendants also concede that the SEC may obtain a freeze of relief defendants' assets to cover any allegedly ill-gotten profits. However, the relief defendants contend that the SEC has cited no authority for the proposition that a relief defendant's assets may be frozen to ensure the SEC's recovery of any penalty incurred by a defendant.

### A. Defendants' Assets

■ Unlike a preliminary injunction enjoining a violation of the securities laws, which requires the SEC to make a substantial showing of likelihood of success as to both a current violation and the risk of repetition, an asset freeze requires a lesser showing. *See SEC v. Unifund SAL,* 910 F.2d 1028 (2d Cir.1990)(court upheld asset freeze, notwithstanding fact that it found evidence insufficient to uphold the entry of a preliminary injunction). To obtain an asset freeze, all the SEC need show is that "it is likely to succeed on the merits," *SEC v. Cavanagh,* 155 F.3d 129, 132 (2d Cir. 1998), or that "[t]here is a basis to infer that the appellants traded on inside information." *Unifund,* 910 F.2d at 1041. Unlike a private litigant, the SEC need not show the risk of irreparable injury. *See Cavanagh,* 155 F.3d at 132.[2]

---

**2.** Because the SEC requests preliminary injunctive relief, an equitable remedy, relief defendants argue that the SEC must meet its burden of showing that the "balance of the hardships tips ... decidedly in [its] favor." Memorandum of Law of Relief Defendant Anita Isacsson, at 9 (quoting *Suffolk Parents of Handicapped Adults v. Wingate,* 101 F.3d 818, 823 (2d Cir.1996)(severely handicapped adults sought preliminary injunction against state for costs of residential care programs)). Relief defendants suggest that the SEC cannot meet this burden in light of the fact that: (1) Anita Isacsson is a 55 year-old homemaker, living on a fixed income; and (2) Bengt and Ruth Hedén are elderly and retired; both have health problems and claim that the frozen funds represent their life savings from

## B. Relief Defendants' Assets

■■■■. A freeze order can apply to non-parties, such as relief defendants allegedly holding the funds of defendants. *See U.S. v. First National City Bank*, 379 U.S. 378, 384, 85 S.Ct. 528, 13 L.Ed.2d· 365 (1965) (district court's issuance of temporary injunction freezing assets of non-party bank "eminently appropriate to prevent further dissipation of assets" from foreign corporation's account). "Federal courts may order equitable relief against a person who is not accused of wrongdoing in a securities enforcement action where that person (1) has received ill-gotten gains; and (2) does not have a legitimate·claim to those funds." *Cavanagh*, 155 F.3d at 136. In *Cavanagh*, the Second Circuit affirmed a freeze order allowing the SEC to recapture fraud proceeds. There, the SEC did not seek a freeze of additional assets of the relief defendant for the purpose of covering any potential penalty. *Id.* at 136–37.

## II. Discussion

### A. Relief Defendants Bengt and Ruth Ingalill Hedén

Approximately $115,600 of the $285,400 frozen from the Hedén Family Account represents profits from the sale of 10,000 shares of Pinkerton stock. The remaining sum, approximately $169,800, reflects the original purchase price of those shares. The evidence presented by the SEC indi-

cates that the assets held· and .traded in the Hedén Family Account did not belong exclusively to Bengt Hedén. Rather, I credit Göran's own testimony that he used, and had the authority to use, the account for his own purposes and his own benefit. If an asset belonging to a relief defendant is, in reality, also an asset of a defendant, then the freeze sought is against the defendant's assets. Accordingly, because the frozen assets in the Hedén Family Account are essentially Göran's own assets, and because Göran is named as a defendant rather than a relief defendant, the $285,-400 in assets from the Hedén Family Account is to remain frozen pending the outcome of the trial.

### 1. The Hedén Family Account

Göran's father, Bengt Hedén, opened the account in 1985 under the name *"Familjen Hedén"* (Swedish for "Hedén Family") to "join the whole fortune of the family and all the property of the family in the same" account. Deposition of Bengt Hedén ("B. Hedén Dep."), dated March 6, 1999, attached to the Supplemental Declaration of Peter Bresnan, counsel for the SEC ("Bresnan Supp. Decl."), dated May 13, 1999, Ex. 1, at 11–12. However, in 1994, Bengt changed the name of the "Account Holder" from the family name to his own name.[3] *Compare* Declaration of Bengt Hedén ("B. Hedén Decl."), dated

---

Mr. Hedén's 35 year career as an airline pilot. In fact, it appears that the frozen assets represent only one-third of the funds Mr. and Mrs. Hedén currently have invested in brokerage accounts. *See* B. Hedén Dep., at 74–75. In any event, the Court need not consider the "balance of the hardships" because such a showing is relevant for an alternative preliminary injunction test which is available only to private litigants. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979)("[t]he standard in the Second Circuit for injunctive relief clearly calls for a showing of (a) irreparable harm and (b) either (1) likelihood of success on the merits *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the prelimi-

nary relief")(emphasis added). The so-called "serious questions on the merits test" is simply not applicable to a preliminary injunction sought by the SEC. *Unifund*, 910 F.2d at 1040 ("we have never applied the 'serious questions on the merits' test to a preliminary injunction sought by the Commission or, for that matter, by any governmental agency, and we are not disposed to do so now").

3. According to defendants, Swedish brokerage accounts contain two names: (1) the "Account Holder" who is the sole legal owner of the account; and (2) the "Account Name" which is the name used "for mailing and other logistical purposes." Memorandum of Law In Opposition to Asset Freeze of Bengt and Ruth Hedén, at 5.

May 17, 1999, Exs. 1 and 2. Nevertheless, the "Account Name" remains *"Familjen* Hedén" to this day. *See* SEC Ex. 90, Bresnan Supp. Decl., Ex. 6. Bengt testified that Göran had no authority to use the Family Account without his father's permission, and that the broker for both Göran's Account and the Family Account, Hagströmer & Qviberg Fondkommission AB ("Hagströmer"), requested Bengt's permission before allowing Göran to use the Family Account for trades on every occasion, except when Göran authorized the Pinkerton trade. *See* B. Hedén Dep., at 56–59.

Contradicting his father's testimony, Göran states that he was a joint-owner of the "brokerage account for the family" and that he had power of attorney to make transactions. *See* Deposition of Göran Hedén ("G. Hedén Dep."), dated April 11, 1999, Bresnan Decl., Ex. 2, at 48. In addition, Göran acknowledges that it was often more advantageous for tax purposes to trade in the Family Account rather than his own. *See* G. Hedén Dep., at 45. Documentary evidence supports Göran's testimony. For example, in 1992, Göran signed an agreement on behalf of the account enabling the account to trade in options. *See* SEC Ex. 94, Bresnan Supp. Decl., Ex. 8. According to a Hagströmer representative, this agreement is still valid. Deposition of Helen Hellners, Hagströmer Legal Counsel, dated April 13, 1999, Bresnan Supp. Decl., Ex. 3, at 5, 16–18. In addition, Göran repeatedly used the principal in the account for stock purchases. In the fourteen months prior to the purchase of Pinkerton (the time period for which the SEC has obtained records), there were nine transfers of either cash or stock between Göran's personal account and the Family Account. According to both father and son, Göran orchestrated these transfers in an effort to engage in short term trades which his employer, Den Norske Bank, prohibited. *See* B. Hedén Dep., at 32–44, 49–52; G. Hedén Dep., at 15–16; Deposition of Karl Arne Henriksson, Den Norske Bank representative,

Bresnan Decl., Ex. 4, at 38–43. The Pinkerton trade was one such transfer. Göran first asked Hagströmer to book his purchase and sale of 10,000 shares of Pinkerton stock in his personal account, and then transferred the trading to the Family Account. *See* G. Hedén Dep., at 37–43.

■ For the reasons discussed above, the assets frozen from the Hedén Family Account are Göran's own assets. Göran's testimony demonstrates that he viewed and treated the Family Account and his own account interchangeably. The account balance represents income from both the father's and son's trades over a fourteen year period. Accordingly, it is inappropriate to apply the two-part *Cavanagh* test to determine whether a "relief defendant's" principal should remain frozen. Rather, I need only determine whether the SEC has met its burden of showing that it is likely to succeed on the merits.

### 2. SEC Has Proven It Is Likely to Succeed On the Merits

■ To establish a claim under § 14(e) of the Exchange Act, the SEC must show that a defendant traded "on the basis of material non-public information concerning a pending tender offer that he knows or has reason to know has been acquired directly or indirectly from an insider of the offeror or issuer, or someone working on their behalf." *U.S. v. Chestman,* 947 F.2d 551, 557 (2d Cir.1991). Overwhelming evidence both circumstantial and direct reveals that defendants attempted to elicit information from an acquaintance with knowledge of the acquisition in an effort to trade on insider information. The evidence indicates that defendants Per Isacsson and Göran Hedén were eager to obtain insider information, that they knew it was illegal to trade on such information and that they attempted to hide their transactions by trading in accounts registered in other people's names. *See, e.g.,* Deposition of David Drescher, Manager of PricewaterhouseCoopers Transaction Services

Dep't., dated March 16, 1999, Bresnan Decl., Ex. 1, at 126–27, 137–39, 141–49, 164–69; Deposition of Per Isacsson ("P. Isacsson Dep."), dated April 10, 1999, Bresnan Decl., Ex. 5, at 87–88, 109–111, 117–18, 123–30, 138–45, 148, 152–54, 178–82; transcripts from audio-taped phone conversations between defendants Per Isaccson and Göran Hedén, Bresnan Decl., Ex. 9, at 1–5, 10, 15; Ex. 10, at 1–7, 11–16, 22, 25–26; Ex. 11, at 10–11.

Based upon this evidence, I find that the SEC is likely to succeed on the merits at trial. Therefore, the principal as well as the profits from the Pinkerton trade credited to the Hedén Family Account will remain frozen in the event that the SEC should recover a penalty against Göran.

### B. Relief Defendant Anita Isacsson

Per Isacsson and his friend, Johan Schelin, traded 2,400 shares of Pinkerton stock through Per's mother's account. *See* Deposition of Anita Isacsson ("A. Isacsson Dep."), dated April 8, 1999, Bresnan Supp. Decl., Ex 4, at 15. A total of roughly $68,000 from Anita Isacsson's account is now frozen, of which approximately $26,000 represents the profits from this trade. Mrs. Isacsson, a fifty-five year old homemaker, opened her account less than one month before the alleged insider trading occurred with approximately $25,000 that she received from the sale of property she had inherited from her father. *See* A. Isacsson Dep., at 15. Lacking any knowledge or interest in securities, Mrs. Isacsson gave Per and her husband power of attorney over the account, and both men subsequently made a number of stock purchases. *See id.*, at 15–18, 21–3, 34–6; Deposition of Per Isacsson ("P. Isacsson Dep."), dated April 10, 1999, SEC Ex. 28 from April 22 Hearing, at 68. According to Anita, "it's Per that's handled and managed the whole thing, it's Per." Anita Isacsson Dep. at 18. Per states that he made the majority of trading decisions, using the account to engage in transactions for his own benefit. *See* P. Isacsson Dep.,

at 65–6, 68, 72. When transactions were profitable, Per "sometimes shared the money" with his mother. *Id.*, at 65–66. "In the family we don't make much of a difference on the money that has to do with the brokerage account." *Id.* at 64, 68.

■ Unlike the long history of Göran's trading activity in the Hedén Family Account and the transfers between Göran's personal account and the Family Account, Per traded through his mother's account for a brief three week period using Mrs. Isacsson's initial $25,000 inheritance. While Per may have had control over the Account and authority to trade in the Account, the evidence is insufficient, at this early stage in the litigation, to support a finding that the SEC is likely to show that Per has an interest in and has benefitted from his mother's account. It is not entirely clear whether Per has ever transferred money or securities from his own personal account into his mother's account, or whether he contributed any funds at all to his mother's initial $25,000 investment. In addition, it is not entirely clear whether Per ever withdrew any funds from his mother's account. At this point, the proof presented is simply inadequate to establish that the funds in the Anita Isaccson account belong to any one other than Anita Isacsson. Accordingly, it is appropriate in this instance to apply the two-part *Cavanagh* test to the asset freeze of relief defendant Anita Isacsson's account.

With respect to the portion of the frozen account that represents the profit from the alleged illegal trade, there is no doubt that the SEC has satisfied the two-prong test of *Cavanagh.* First, there is no dispute that her account may have received the alleged "ill-gotten gains" of insider trading, *Cavanagh*, 155 F.3d at 136. Second, Mrs. Isacsson does not have a "legitimate claim" to those profits. *Id.* Indeed, her attorney has agreed that the profits from this trade should remain frozen until the case is finally decided. Hence, it is appropriate under *Cavanagh* to continue the asset freeze with respect to the profits

from the sale credited to Anita Isacsson's Account.

However, Anita Isacsson herself is not accused of any wrongdoing, and the SEC has not cited any authority for the proposition that a relief defendant's assets may be frozen to ensure payment of a penalty.[4] Consequently, it is not appropriate to continue the asset freeze with respect to the amount used by Anita Isacsson's son to purchase the Pinkerton stock.[5]

### III.  Conclusion

For the foregoing reasons, it is hereby ordered that Hagströmer & Qviberg, Brown Brothers Harriman, Den Norske Bank, Schroeder & Co. and Lewco Securities Corp.:

Continue to hold and retain within their control, and otherwise prevent any disposition, transfer or dissipation whatsoever of any and all proceeds of the sale of common stock of Pinkerton's, Inc. and any and all proceeds of the sale of securities of Pinkerton's, Inc. which were purchased through accounts in the name of Bengt Hedén or the Hedén Family;

Continue to hold and retain within their control, and otherwise prevent any disposition, transfer or dissipation whatsoever of any profits from the sale of common stock of Pinkerton's, Inc. and profits from the sale of securities of Pinkerton's, Inc. which were purchased through accounts in the name of Anita Isacsson;

Release the principal amount used to invest in the Pinkerton, Inc., stock or securities from accounts in the name of Anita Isacsson; and

Release any and all proceeds of the sale of 600 of the 5,000 shares of Pinkerton,

Inc., stock from Den Norske Bank's custody account with Brown Brothers Harriman (Account No. 3294246) and credit these assets to the account of Magnus Brundin at Den Norske Bank.

SO ORDERED.

---

4.  There is no authority for the proposition that the *Cavanagh* test applies to any assets of a relief defendant other than the profits from an illegal trade. Even if it did, the SEC has failed to satisfy that test. First, the principal used to purchase the stock does not represent "ill-gotten gains." Second, and perhaps more important, Mrs. Isacsson has a "legitimate claim" to those funds.

5.  Because Per's purchase of the Pinkerton stock was a margin trade, presumably a portion of the unfrozen principal will be used to reimburse the brokerage house, and Anita Isacsson will receive the balance in her account.