REVISED, March 25, 1998

**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

---

No. 96-30664

---

STAFFORD J. COOLBAUGH,

Plaintiff - Appellant,

VERSUS

STATE OF LOUISIANA,

Defendant - Appellee.

---

Appeal from the United States District Court
For the Western District of Louisiana

---

February 27, 1998

Before DAVIS, SMITH and DUHÉ, Circuit Judges.

DAVIS, Circuit Judge:

Stafford J. Coolbaugh, a quadriplegic, filed this action against the State of Louisiana in federal court alleging that the State violated Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131-12165 (1994), by discriminating against him on the basis of his disability. The district court denied Coolbaugh's motion for summary judgment and the jury eventually returned a verdict in favor of the State. Coolbaugh has appealed the district court's denial of his summary judgment motion, as well as the take nothing judgment entered on the jury's verdict. Before

turning to the merits, we consider whether jurisdiction was proper. Specifically, we consider whether the ADA represents an appropriate Congressional exercise of its Section 5 enforcement power so as to override the State of Louisiana's Eleventh Amendment immunity. In light of the Supreme Court's decisions in <u>Seminole Tribe of Florida v. Florida</u>, 116 S. Ct. 1114 (1996), <u>City of Boerne v. Flores</u>, 117 S. Ct. 2157 (1997), and <u>City of Cleburne, Texas v. Cleburne Living Center, Inc.</u>, 473 U.S. 432 (1985), we hold that the provisions of the ADA are enforceable against a state because the enactment of this legislation was a valid exercise of Congress' Section 5 enforcement power, and for that reason does not infringe upon Louisiana's rights under the Eleventh Amendment. On the merits, we find no error and affirm.

I.

Coolbaugh and his family moved to Louisiana in 1993 after living in California for many years. While he was a California resident, Coolbaugh received a driver's license permitting him to operate a specially equipped, hand-controlled automobile. Coolbaugh's testimony revealed that he had used his California license for identification purposes, but not to drive. Upon their arrival in Louisiana, Coolbaugh and his wife went to the local Office of Motor Vehicles to obtain Louisiana driver's licenses.

Generally, a new Louisiana resident may obtain a Louisiana driver's license by presenting a valid out-of-state license and passing an eye exam. Coolbaugh's wife, who was not disabled, followed this procedure and obtained a Louisiana driver's license.

2

An employee of the Office of Motor Vehicles told Coolbaugh, however, that in addition to the usual requirements, he must complete a special medical form and pass a road test in his own hand-controlled vehicle. Although Coolbaugh's doctor certified that Coolbaugh could safely drive a "handicapped controlled vehicle," Coolbaugh failed to supply his own hand-controlled vehicle or otherwise to take and pass the required road test. As a result, Louisiana declined to issue Coolbaugh a Louisiana driver's license.

Coolbaugh brought the current action against the State of Louisiana in federal court alleging that the State violated Title II of the ADA by treating him and his nondisabled wife differently with respect to the issuance of Louisiana driver's licenses. The district court denied Coolbaugh's motion for summary judgment, and the case proceeded to trial. The jury returned a verdict in favor of Louisiana, finding that the State had not discriminated against Coolbaugh on the basis of a disability. Coolbaugh appeals both the district court's denial of his motion for summary judgment and the jury's verdict.

## II.

The Eleventh Amendment provides immunity to states from suits in federal court by private persons. The Eleventh Amendment states that:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. The Supreme Court has broadly construed the Eleventh Amendment's narrow language, to embrace the larger principle that a state is granted immunity from suits initiated by private entities or persons in federal court, if the state has not consented to such suits. Seminole Tribe of Florida v. Florida, 116 S. Ct. 1114, 1122 (1996) ("[W]e have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition . . . which it confirms.") (quoting Blatchford v. Native Village of Noatak, 501 U.S. 775, 779 (1991)).

Congress has the authority to abrogate states' immunity in certain circumstances pursuant to Congress' powers under Section 5 of the Fourteenth Amendment. Section 5 provides that "Congress shall have power to enforce, by appropriate legislation, the provisions of this article." U.S. Const. amend. XIV, § 5. Among the provisions is Section 1's mandate that

> [n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

Id., § 1.

Seminole Tribe established a two-pronged test for determining the validity of Congress' abrogation of state immunity through the exercise of its Section 5 enforcement power. First, a court must determine whether Congress "unequivocally expresse[d] its intent to abrogate the immunity." 116 S. Ct. at 1123 (quoting Green v. Mansour, 474 U.S. 64, 68 (1985)). Second, a court must determine whether Congress acted "pursuant to a valid exercise of power."

4

Id. (quoting Green, 474 U.S. at 68).

The first prong--Congress' intent to abrogate state immunity--is patently clear in the ADA.  Section 12202 of the ADA provides that "[a] State shall not be immune under the eleventh amendment [sic] to the Constitution of the United States from an action in Federal or State court of competent jurisdiction for a violation of this chapter."  42 U.S.C. § 12202.  See also Clark v. California, 123 F.3d 1267, 1269 (9th Cir. 1997) (finding that in the ADA, Congress "unequivocally expressed its intent to abrogate the State's immunity").

The second prong--whether Congress has abrogated state immunity in the ADA through a valid exercise of its enforcement power--is less clear.  The Constitution allows Congress to enforce the Fourteenth Amendment, and the Supreme Court held in City of Cleburne, Texas v. Cleburne Living Center, Inc. that disabled persons are protected by the Equal Protection Clause.[1] 473 U.S.

---

[1] We recognize that Cleburne specifically addressed the mentally disabled, and not the physically disabled.  However, we are persuaded that its reasoning applies to the physically disabled as well.  In arguing against extension of heightened scrutiny to mentally disabled individuals, the Court pointed out the difficulty of "distinguish[ing] a variety of other groups who have perhaps immutable disabilities setting them off from others, who cannot themselves mandate the desired legislative responses, and who can claim some degree of prejudice from at least part of the public at large." Cleburne, 473 U.S. at 445.  The Court then listed such indistinguishable groups, naming "the aging, the disabled, the mentally ill, and the infirm." Id. at 446.  Rejecting the eligibility of these groups for heightened scrutiny, the Court stated, "[w]e are reluctant to set out on that course, and we decline to do so." Id.  This assignment of rational basis review to physically disabled persons has been recognized and applied by numerous courts after Cleburne. See Hansen v. Rimel, 104 F.3d 189, 190 n.3 (8th Cir. 1997) ("Although protected by statutory enactments such as the [ADA], the disabled do not constitute a

432, 450 (1985).

In Cleburne, the City of Cleburne denied a special use permit to a proposed operator of a group home for the mentally retarded. Id. at 435-37. The plaintiffs challenged the denial, arguing that the zoning ordinance requiring a permit violated the equal protection rights of the mentally retarded. Id. at 437. The Supreme Court held that "legislation that distinguishes between the mentally retarded and others must be rationally related to a legitimate governmental purpose." Id. at 446.

Thus, applying Cleburne, the disabled are protected by the Equal Protection Clause and Congress is entitled to enforce this protection against the states despite the Eleventh Amendment. The Court last term, however, in City of Boerne v. Flores, declared that Congress' power in this respect is not unlimited. 117 S. Ct. 2157 (1997).

Flores arose out of the City of Boerne's rejection of the Archbishop of San Antonio's permit application to enlarge a historically significant church. Id. at 2160. The Archbishop

---

"suspect class" for purposes of equal protection analysis."); Suffolk Parents of Handicapped Adults v. Wingate, 101 F.3d 818, 824-27 (2d Cir. 1996) (applying rational basis standard to claims of handicapped individuals who challenged a state's denial of funding), *cert. denied*, 117 S. Ct. 1843 (1997); Does v. Chandler, 83 F.3d 1150, 1155 (9th Cir. 1996) ("For the purposes of equal protection analysis, the disabled do not constitute a suspect class."); Spragens v. Shalala, 36 F.3d 947, 950 (10th Cir. 1994) (holding that "a classification applying to blind persons is not suspect, or even quasi-suspect, and we therefore apply the 'rational basis' standard, rather than some more strict one"); More v. Farrier, 984 F.2d 269, 271 (8th Cir.), *cert. denied*, 510 U.S. 819 (1993) (holding that the wheelchair-bound are not a suspect class).

brought an action claiming, among other things, that rejection of the permit violated The Religious Freedom Restoration Act of 1993 ("RFRA"). 107 Stat. 1488 (codified at 42 U.S.C. §§ 2000bb to 2000bb-4 (1994)). The Court held that RFRA, legislation passed pursuant to Congress' enforcement power under Section 5 of the Fourteenth Amendment, was unconstitutional because it exceeded Congress' enforcement power. Flores, 117 S. Ct. at 2172.

The Flores Court declared that "§ 5 is 'a positive grant of legislative power' to Congress." Id. at 2163 (quoting Katzenbach v. Morgan, 384 U.S. 641, 651 (1966)). The Flores Court restated its longstanding view that

> [w]hatever legislation is appropriate, that is, adapted to carry out the objects the amendments have in view, whatever tends to enforce submission to the prohibitions they contain, and to secure to all persons the enjoyment of perfect equality of civil rights and the equal protection of the laws against State denial or invasion, if not prohibited, is brought within the domain of congressional power.

Id. at 2163 (quoting Ex parte Virginia, 100 U.S. 339, 345-46 (1879)). The Flores Court affirmed the historical principle that Congress has the authority to both remedy and prevent constitutional violations. Id. at 2164-67. In addition, the Court restated its historical view that

> [l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'

Id. at 2163 (quoting Fitzpatrick v. Bitzer, 427 U.S. 445, 455 (1976)). In contrast to its affirmation of Congress' Section 5

powers, the Court was clear in its mandate that Congress may not "determine what constitutes a constitutional violation." Id. at 2164.

The Flores Court explained Congress' Section 5 authority to adopt legislation that remedies or prevents constitutional violations by reciting examples from earlier cases. Id. at 2166-67. For example, the Supreme Court "upheld a suspension of literacy tests and similar voting requirements under Congress' parallel power to enforce the provisions of the Fifteenth Amendment . . . to combat racial discrimination in voting." Id. at 2163 (citing South Carolina v. Katzenbach, 383 U.S. 301, 308 (1966)) (citation omitted). The Court upheld this legislation to prevent violations despite its earlier decision upholding the constitutionality of the literacy tests in Lassiter v. Northampton County Bd. of Elections, 360 U.S. 45 (1959). The Supreme Court has "also concluded that other measures protecting voting rights are within Congress' power to enforce the Fourteenth and Fifteenth Amendments, despite the burdens those measures placed on the States." Flores, 117 S. Ct. at 2163.

In Flores, the Court stated that "the line between measures that remedy or prevent unconstitutional actions and measures that make a substantive change in the governing law is not easy to discern, and Congress must have wide latitude in determining where it lies." Id. at 2164. The Court held that to be a valid exercise of power under Section 5, "[t]here must be *a congruence and proportionality between the injury to be prevented or remedied*

8

*and the means adopted to that end.*" Id. (emphasis added). As guidance to applying this test, the Court stated that "[t]he appropriateness of remedial measures must be considered in light of the evil presented." Id. at 2169 (citation omitted).

In summary, the Supreme Court has instructed us that Congress is authorized to adopt legislation that remedies or prevents unconstitutional conduct, provided there is a "congruence and proportionality between the injury to be prevented or remedied and the means adopted to that end." Id. at 2164. This proportionality inquiry has two primary facets: the extent of the threatened constitutional violations, and the scope of the steps provided in the legislation to remedy or prevent such violations.

In making our proportionality review, as Flores directs, we must consider the ADA's scope in light of the evil it addresses. We first turn to findings in the ADA where Congress detailed its understanding of the extent of the evil it was addressing-- discrimination against the disabled.[2]

> (1) some 43,000,000 Americans have one or more physical or mental disabilities, and this number is increasing as the population as a whole is growing older;
> (2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem;
> (3) discrimination against individuals with disabilities persists in such critical areas as

---

[2] The findings in the ADA distinguish it from RFRA, 42 U.S.C. §§ 2000bb to 2000bb-4, in which Congress made no specific findings regarding the seriousness or the scope of discrimination against religious persons.

employment, housing, public accommodations, education, transportation, communication, recreation, institutionalization, health services, voting, and access to public services;

(4) unlike individuals who have experienced discrimination on the basis of race, color, sex, national origin, religion, or age, individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination;

(5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities;

(6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and educationally.[3]

---

[3] The principal findings regarding the existence of discrimination are listed above. Congress also found:

(7) individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society;

(8) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and

(9) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and

42 U.S.C. § 12101 (a) (1995).

We must give these congressional findings substantial deference. "In reviewing the constitutionality of a statute, 'courts must accord substantial deference to the predictive judgments of Congress.'" Turner Broad. Sys., Inc. v. FCC (Turner II), 117 S. Ct. 1174, 1189 (1997) (quoting Turner Broad. Sys., Inc. v. FCC (Turner I), 512 U.S. 622, 665 (1994) (Kennedy, J. Op.)).

The Court in Flores reaffirmed this bedrock principal when it stated that "[i]t is for Congress in the first instance to 'determin[e] whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment,' and its conclusions are entitled to much deference." 117 S. Ct. at 2172 (quoting Morgan, 384 U.S. at 651).

The Turner II Court instructs that the judiciary's "sole obligation is 'to assure that, in formulating its judgments, Congress has drawn reasonable inferences based on substantial evidence.'" 117 S. Ct. at 1189 (quoting Turner I, 512 U.S. at 666 (Kennedy, J. Op.)).

Deference to the judgment of Congress is particularly appropriate in this case, because in Cleburne, the Court identified Congress as the ideal governmental branch to make findings and decisions regarding the legal treatment of the disabled. 473 U.S. at 442-43. In Cleburne, the Court stated: "How this large and diversified group is to be treated under the law is a difficult and

---

nonproductivity.

42 U.S.C. § 12101(a) (1995).

often a technical matter, very much a task for legislators guided by qualified professionals and not by the perhaps ill-informed opinions of the judiciary." Id.

Before enacting the ADA, Congress considered a wide range of evidence and made findings.  Both the House and the Senate cited *seven* substantive studies or reports to support its conclusion that discrimination against the disabled is a serious and pervasive problem.  S. Rep. No. 101-116, at 6 (1989); H.R. Rep. No. 101-485, pt. 2, at 28 (1990) (Both citing National Council on the Handicapped, On the Threshold of Independence (Jan. 1988) (updating the legislative changes recommended in Toward Independence); Report of the Presidential Commission on the Human Immunodeficiency Virus Epidemic (June 1988) (reviewing the medical, financial, ethical, policy, and legal issues that affect those afflicted with HIV); Louis Harris and Associates, The ICD (International Center for the Disabled) Survey II:  Employing Disabled Americans (1987) (surveying  210 top managers, 301 equal employment managers, 210 department heads and line managers, and 200 top managers in companies employing 10-49 people); Louis Harris and Associates, The ICD (International Center for the Disabled) Survey of Disabled Americans:  Bringing Disabled Americans into the Mainstream (March 1986) (surveying 1000 disabled persons); National Council on the Handicapped, Toward Independence (Feb. 1986) (reviewing different laws and programs that affect disabled persons and offering recommendations for legislative changes); U.S. Commission on Civil Rights, Accommodating the Spectrum of Individual Abilities (Sept.

12

1983) (reporting on, among other things, the history, nature, and extent of discrimination against the disabled); <u>From ADA to Empowerment: The Report of the Task Force on the Rights and Empowerment of Americans with Disabilities</u> (Oct. 12, 1990) (compiling findings and recommendations following the formation of a Task Force, which conducted 14 Washington, D.C., teleconference meetings with participants from across the country, held 63 public forums in the 50 states and some territories, held other meetings involving 25,000 participants, testified in congressional hearings, met with legislative and executive staff members, met with the President, Vice President and various Cabinet members, and met with opponents of the ADA)). The legislative history also includes a wealth of testimonial and anecdotal evidence from a spectrum of parties to support the finding of serious and pervasive discrimination.[4]

---

[4] <u>See, e.g.</u>, S. Rep. No. 101-116, at 6 (1989)(quoting the testimony of Timothy Cook of the National Disability Action Center, regarding the mentally and emotionally debilitating effects of discrimination); <u>id.</u> at 6-7 (quoting the testimony of Judith Heumann of the World Institute on Disability, regarding her personal history of discrimination due to her disability); <u>id.</u> at 7 (citing a Washington Post article in March, 1988, profiling a zoo keeper's refusal to admit children with Downs Syndrome); <u>id.</u> at 8 (citing testimony about a Kentucky woman who was fired because her son, ill with AIDS, moved into her home so she could provide care for him); <u>id.</u> at 7 (citing the discrimination apparent in the facts of <u>Alexander v. Choate</u>, 469 U.S. 287 (1985), in which a child with cerebral palsy was excluded from the classroom because the teacher believed the child's appearance nauseated classmates); <u>id.</u> at 9 (citing the testimony of U.S. Attorney General Dick Thornburgh (on behalf of President Bush), profiling the isolation and dependence faced by the disabled); <u>id.</u> at 10 (citing the testimony of Harold Russell, Chair of the President's Committee on Employment of People with Disabilities, that a majority of disabled persons require no reasonable accommodation, and many others require only an inexpensive one); <u>id.</u> at 12 (citing testimony regarding the

13

We are satisfied that the extensive record compiled in the legislative history fully supports Congress' detailed findings of a serious and pervasive problem of discrimination against the disabled. As stated above, these findings are entitled to deference. Because Congress found a significant likelihood of unconstitutional actions and therefore a significant "evil" to be addressed, the only remaining inquiry is whether the scope of the ADA is so "sweeping" that the statute cannot be seen as proportional to the evil Congress sought to address.

We are persuaded that Congress' scheme in the ADA to provide a remedy to the disabled who suffer discrimination and to prevent such discrimination is not so draconian or overly sweeping to be considered disproportionate to the serious threat of discrimination Congress perceived. The ADA first sets forth broad provisions generally outlawing discrimination.[5] In addition to these general

_____

inaccessibility of many polling places to disabled persons).

[5] Title I and Title II each contain a broad mandate. See, e.g., 42 U.S.C. § 12112(a):

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

See also 42 U.S.C. § 12132:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

provisions outlawing discrimination, Congress made specific judgments in particular circumstances as to what it perceived to be reasonable and appropriate to prevent unconstitutional discrimination. For example, in Title I, 42 U.S.C. § 12112(b)(5)(A) declares it discriminatory to reject an employee whose mental or physical limitation may be reasonably accommodated, so long as such accommodation does not cause undue burden; § 12112(d) declares it discriminatory to subject a potential employee to medical examinations or inquiries; and § 12113 provides a defense to an entity that refuses employment to a disabled person when the refusal is "job-related and consistent with business necessity." Included in the provisions of Title II is 42 U.S.C. § 12142(a), which requires entities that purchase or renovate new buses or rail vehicles to ensure that such new or renovated vehicles be accessible to the disabled, and 42 U.S.C. § 12148(b), which requires that at least one car per train is accessible to the disabled. Congress made these particularized judgments after hearing testimony on the reasonableness and feasibility of these provisions. See, e.g., H.R. Rep. No. 101-485, pt. 2, at 44-45 (1990) (citing testimony that businesses will benefit from the ADA because the labor pool will improve); id. at 45 (citing employee expertise and performance benefits that accrue to corporations that make accommodations); id. (citing testimony from a former CEO of small and large companies, arguing that the ADA is affordable and is "good business"); id. at 46 (citing testimony regarding the Marriott Corporation's success as a result

15

of policies similar to those established in the ADA).

In sum, the ADA represents Congress' considered efforts to remedy and prevent what it perceived as serious, widespread discrimination against the disabled. We recognize that in some instances, the provisions of the ADA will "prohibit[] conduct which is not itself unconstitutional and intrude[] into 'legislative spheres of autonomy previously reserved to the States.'" Flores, 117 S. Ct. at 2163 (quoting Fitzpatrick, 427 U.S. at 455). We cannot say, however, in light of the extensive findings of unconstitutional discrimination made by Congress, that these remedies are too sweeping to survive the Flores proportionality test for legislation that provides a remedy for unconstitutional discrimination or prevents threatened unconstitutional actions.

In concluding that Congress did not exceed its Section 5 power in adopting the ADA, we join the only other circuit that has considered the issue since the Court decided Flores. In Clark, the Ninth Circuit upheld the constitutionality of the ADA as a proper exercise of Congress' Section 5 power. 123 F.3d at 1270. The panel concluded that

> [i]n both acts, Congress explicitly found that persons with disabilities have suffered discrimination. Both the ADA and the Rehabilitation Act therefore are within the scope of appropriate legislation under the Equal Protection Clause as defined by the Supreme Court. At the same time, neither act provides remedies so sweeping that they exceed the harms that they are designed to

16

redress.

Id. For these reasons, the Ninth Circuit concluded that "both the ADA and the Rehabilitation Act were validly enacted under the Fourteenth Amendment." Id.

Congress' inclusion of detailed findings in the ADA is an important distinguishing feature between this case and Flores. In contrast to the extensive findings Congress made in the ADA, Congress made no findings in RFRA of widespread unconstitutional treatment of religious persons. Indeed, the Flores Court concluded that "the emphasis of the hearings [related to RFRA] was on laws of general applicability which place incidental burdens on religion." Flores, 117 S. Ct. at 2169. The detailed factual findings in the ADA, which require our deference, are critical to the application of the Flores proportionality review.

Also, we are convinced that the threat posed by RFRA to our principles of separation of powers is not similarly posed by the ADA. In the ADA, Congress included no language attempting to upset the balance of powers and usurp the Court's function of establishing a standard of review by establishing a standard different from the one previously established by the Supreme Court. Congress performed one of its traditional legislative functions by finding facts relating to proposed legislation. The Supreme Court may in the future, if it chooses to do so, reconsider the Cleburne standard of review in light of the Congressional findings. However, this conflict is not a sufficient reason for us to invalidate the ADA.

17

The dissent seems to conclude that Congress does not have the power under § 5 to prohibit constitutional conduct. We disagree. The Flores court stated

> [l]egislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional and intrudes into 'legislative spheres of autonomy previously reserved to the States.'

Id. at 2163 (quoting Fitzpatrick, 427 U.S. at 455).

We therefore hold that the ADA represents a proper exercise of Congress' Section 5 enforcement power under the Fourteenth Amendment. As a result, Louisiana is not entitled to Eleventh Amendment immunity from suits brought pursuant to the ADA.

III.

We now turn to the merits. The record fully supports the jury's finding that the state did not discriminate against Mr. Coolbaugh, who was a paraplegic, by requiring that he demonstrate his ability to drive on the state's roadways by taking a driving test. A number of plausible explanations may be offered for the verdict. Perhaps the clearest one that is fully supported by the evidence is that the state's refusal to issue Mr. Coolbaugh a driver's license based on his possession of a California license was not motivated, even in part, by its desire to discriminate against him because of his disability. Rather, its decision was motivated by a desire to protect the public on the state's highways. Mr. Coolbaugh's argument that, absent discrimination, the state would have accepted his California driver's license as sufficient evidence of his ability to drive was particularly

18

unpersuasive.  The evidence revealed that though Coolbaugh held a valid California driver's license, he had not actually driven a vehicle since obtaining his license, and had used the license only for identification purposes.  Because the verdict is fully supported by the record and we find no reversible error, the judgment of the district court is affirmed.

AFFIRMED.